**MATANUSKA ELECTRIC ASSOCIATION, INC., a non-profit electric membership cooperative, Appellant,**

v.

**CHUGACH ELECTRIC ASSOCIATION, INC., a non-profit electric membership cooperative, Appellee.**

No. S–9839.

Supreme Court of Alaska.

Aug. 23, 2002.

---

Stephen M. Ellis and Jeffrey P. Stark, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellant.

Donald W. Edwards, Chugach Electric Association, Anchorage, and Andrew F. Behrend, Heller Ehrman White & McAuliffe LLP, Anchorage, for Appellee.

Virginia A. Rusch, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Amicus Curiae Regulatory Commission of Alaska.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Retroactive ratemaking by a utility is prohibited in Alaska, as it is in the majority of jurisdictions in the United States. The Regulatory Commission of Alaska compelled Chugach Electric Association to refund payments collected as a result of a miscalculation in the cost of generation and transmission line loss. The superior court, concluding that the commission's ruling constituted retroactive ratemaking, reversed the commission's order. We agree, and therefore affirm the decision of the superior court.

1.  Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, 1991 U. ILL. L.REV. 983, 993.

2.  In 1999, the name "Regulatory Commission of Alaska" was substituted for "Alaska Public Utilities Commission" in accordance with ch. 25, § 30(a), SLA 1999.

3.  AS 42.05.371.

4.  As MEA notes,
    under 3 AAC 48.220, an original and 10 copies of each utility tariff filing must be provided to the Commission at least 45 days prior to the

## II. FACTS AND PROCEEDINGS

"To comprehend the rule against retroactive ratemaking [as well as the facts involved in a retroactive ratemaking case], it is necessary first to understand the process for the setting of public utility rates."[1]

### A. Background

The provision of electric service by Chugach Electric Association, Inc. (Chugach) and Matanuska Electric Association, Inc. (MEA) is governed by AS 42.05. Because Chugach and MEA are electrical cooperatives organized under AS 10.25, they come under the provisions of AS 42.05.

Chugach generates electricity and sells it wholesale to MEA. Chugach's rates have two components: a base rate and an adjustment to that rate known as a fuel surcharge. The base rate reflects the fixed costs of providing electric service, as well as other costs that tend to remain stable. The fuel surcharge is a fluctuating charge that operates to protect Chugach against those costs associated with purchasing and generating power that are not as stable.

A utility's rates and business practices are governed by the tariffs it has in effect with the Regulatory Commission of Alaska[2] (commission).[3] The filing or revision of a tariff is a complicated and lengthy process.[4] As a means of expediting the procedure, Alaska state law allows utilities to utilize a simplified rate filing process.[5] The simplified rate filing process allows utilities to modify their base rates through quarterly or semi-annual rate filings.[6] Through this process, utilities are allowed to adjust their base rates, subject to certain limitations,[7] without filing and litigating full rate cases.

proposed effective date. Moreover, 3 AAC 48.275 sets forth a voluminous list of supporting materials that must accompany a permanent or interim tariff revision. The Commission examines the information provided in the course of its investigation, which can take several months to complete.

5.  AS 42.05.381(e).

6.  3 Alaska Administrative Code 48.710(b) (2000).

7.  3 AAC 48.770.

While the simplified rate filing is a means for a utility to have an expedited procedure to establish its base rate, a Cost of Power Adjustment Filing allows the same expedited process for surcharges. The Fuel and Purchased Power Cost Adjustment Factors (fuel surcharge filing) is an adjustment Chugach filed with the commission to its base rate and is the focus of the present dispute. This surcharge is calculated through a procedure established in a tariff similar to the simplified rate filing process. Through this mechanism, the commission permits utilities such as Chugach to collect a surcharge designed to recover fluctuations in fuel costs relative to costs in the base rate.[8] Fuel surcharge filings are not subject to the same review as the base rate, although there are some similarities between the fuel surcharge filing procedure and simplified rate filing procedure.

This appeal involves the use of an estimated generation and transmission system energy loss in Chugach's fuel surcharge filings. A generation and transmission line loss factor is an adjustment to the base rate to reflect the amount of electric energy that is lost through its generation and transmission. This amount varies and cannot always be accurately predicted. Because of the fluctuations, it is part of the fuel surcharge and is adjusted on a periodic basis.

Additionally, because the fuel surcharge is an estimate, the amount collected might fall short or exceed the actual cost of a utility's fuel and purchased power. After a given period, the commission reconciles fuel cost recoveries collected through a fuel surcharge. Such recoveries are collected in a balancing account and only balance "over-or undercollections occurring in the immediately preceding quarter through adjustments for the following quarter." "The purpose of these 'true-up' proceedings is to determine whether the amounts passed through to customers were in accordance with the [actual surcharge]."[9] Thus, whatever variances occur are taken into account when calculating the next quarterly fuel surcharge filing.

## B.  Facts

Chugach's fuel surcharge was approved in 1987 and governed Chugach's collection of fuel surcharges. Approval authorized Chugach to collect fuel surcharges as an adjustment to base rates if certain requirements were met. Approval of the surcharge permitted adjustments to the rate on a quarterly basis. The amount of the permissible adjustment was the difference between the estimated fuel and purchase power costs for the upcoming quarter and the base amount established in the tariff. To support these estimates, Chugach was required to file a tariff advice letter with the commission, no later than forty-five days after the beginning of each quarter, along with tariff sheets showing the fuel surcharges, studies of its fuel and purchased power costs, documentation of those costs, as well as other supporting documentation.

The Fuel and Purchased Power Cost Adjustment Factors established a balancing account to reconcile the fuel surcharge with actual fuel costs. Through separate accounts for wholesale and retail customers, Chugach debited the actual monthly fuel and purchased power costs and credited the total of the base rate plus the fuel surcharge in effect for that month multiplied by the number of kilowatt hours sold. The commission was permitted to adjust Chugach's fuel surcharge rates individually and in its simplified rate filing each quarter, but only under limited circumstances. The procedures established by the Fuel and Purchased Power Cost Adjustment Factors provided that all fuel surcharge rates are subject to review and adjustment after being implemented unless "sooner authorized" by the commission.

Chugach sought and gained the approval of the commission before each surcharge was implemented. At the time the commission's approval is sought, the same information is submitted to Chugach's customers. Thus, MEA received a copy of Chugach's fuel sur-

---

8.  These surcharges can also be referred to as fuel cost adjustment clauses. "[T]he purpose of such a clause is to permit prompt rate adjustment to offset unusual changes in fuel costs...." *Southern California Edison Co. v. Pub. Utils. Comm'n,* 20 Cal.3d 813, 144 Cal.Rptr. 905, 576 P.2d 945, 947 (1978).

9.  Krieger, *supra* note 1, at 1017.

charge documentation each time it was submitted to the commission. A fuel surcharge filing can total well over 100 pages.

Upon submitting its fuel surcharge filing to the commission, Chugach's documents are reviewed and a tariff action memorandum is prepared by a utility tariff analyst. All of the tariff action memoranda in this case reflect that the documents were in fact received, reviewed, and that the calculations contained in them were correct. In each tariff action memorandum, the utility tariff analyst recommended the commission approve Chugach's tariff advice letter submitting that quarter's fuel surcharge. Each tariff advice letter submitted for the 1995–1997 period received commission approval before it became effective. Each contained that quarter's fuel surcharge rate.

Since the mid–1980s, Chugach has used a line loss factor of 5.219% in its rate filings for wholesale customers. In a general rate case in 1987, the commission issued an order formally approving this factor as an appropriate reflection of Chugach's transmission line losses. This line loss factor was identified in all of Chugach's simplified rate filings and each of the quarterly fuel surcharge filings that the commission later approved.

In November 1997 Chugach and MEA discovered a discrepancy in the line loss factor Chugach used in its projected fuel surcharges. Chugach's own documents showed the actual line loss experienced by Chugach in 1995, 1996, and 1997 was substantially lower than the 5.219% Chugach had claimed in its simplified rate filings and fuel surcharge filings. On June 25, 1999 a utility tariff analyst recommended suspension of the surcharge.

When confronted with the discrepancy between its actual line losses and what it had charged for line losses, Chugach acknowledged and rectified the error. Chugach then submitted revised tariffs to the commission that more accurately reflected the line loss factor in future rates. Chugach, however, refused to refund the overcharged tariffs,

invoking the doctrine prohibiting retroactive ratemaking.

## C. Proceedings

This appeal arises from commission docket number U–96–37. Until December 1997 the issues in that docket were limited to Chugach's base rates established through the simplified rate filing process. On December 19, 1997 MEA raised the issue of the incorrect generation and transmission line loss factor. MEA asked the commission to correct Chugach's line loss factor and demanded a refund based on the difference between the incorrect line loss factor and the corrected one.

In Order U–96–37(13) issued on July 1, 1998, the commission ordered Chugach to recalculate its fuel surcharges for 1995 using the actual line loss factor for that year. The commission also ordered Chugach to refund an amount based on the difference between the original line loss factor and the revision to its wholesale customers. In making its decision, the commission noted that "the principles relevant to retroactive ratemaking are not applicable to fuel adjustment clauses."

Both Chugach and MEA sought reconsideration of the commission's order. Chugach argued the commission overlooked the prohibition against retroactive ratemaking, creating "confiscatory rates which result in taking Chugach property without due process of law." The commission denied Chugach's request for reconsideration. MEA's petition for reconsideration asserted that the commission's previous order was internally inconsistent. MEA noted the order only addressed the use of the newly calculated generation and transmission line loss factor for 1995, failing to require a new line loss factor be utilized for the 1996 and 1997 portions of the refund. The commission granted MEA's request and ordered refunds for the additional years using the actual line loss factor from those particular years.

Chugach appealed the commission's decisions in U–96–37(13) and U–96–37(18)[10] to

---

10. This was the order granting MEA's petition for reconsideration and denying Chugach's mo-

tion for reconsideration.

the superior court. Both MEA and the commission filed briefs in response. On July 27, 2000 the superior court reversed the commission's decision. In his decision, Superior Court Judge Peter A. Michalski held that the commission clearly erred "in its determination that Chugach's use of the tariff mandated line loss factor was 'incorrect';" Judge Michalski also held "that going back more than one quarter in the correction of a Cost of Power Adjustment constitutes retroactive rate making."

MEA now appeals. The commission declined to pursue an appeal and is no longer a party to this action. It has, however, filed an *amicus curiae* brief outlining its position.

## III. STANDARD OF REVIEW

In an administrative appeal where the superior court acts as an intermediate appellate court, we directly review the agency action in question.[11] "As we substitute our judgment, it is our duty 'to adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[12]

Whether the commission's decision ordering Chugach to refund MEA payments collected from fuel surcharges constitutes unlawful ratemaking is a question of law. Because assessing the scope of an agency's authority "involves statutory interpretation, or analysis of legal relationships, about which courts have specialized knowledge and expertise," our independent judgment is used.[13] "However, even under the independent judg-

ment standard [we have] noted that the court should give weight to what the agency has done, especially where the agency interpretation is longstanding."[14]

The commission's findings of fact are reviewed for clear error and are only reversed if there is not substantial evidence to support them.[15]

## IV. DISCUSSION

### A. The Rule Against Retroactive Ratemaking

Both MEA and Chugach agree that retroactive ratemaking is impermissible under Alaska state law. We concur.

" 'A fundamental rule of ratemaking is that rates are exclusively prospective in nature.' "[16] One purpose of having such a rule is a consumer's right to rely on rates set by the commission. "Some reliability, of course, is essential to the public utility regulatory system. If commissions could retroactively change rates willy-nilly,[17] and ratepayers' bills and utility revenues were continually subject to large fluctuations, serious questions would arise concerning the legitimacy of the ratemaking process."[18] Thus, the rule is critical for a utility to plan its finances.[19] Other purposes for prohibiting retroactive rates include "investor confidence, utility credit rating, and the integrity of service."[20] And "[r]etroactivity, even where permissible, is not favored, except upon the clearest mandate."[21]

11. *See Northern Alaska Envtl. Ctr. v. State, Dep't of Natural Res.*, 2 P.3d 629, 633 (Alaska 2000).

12. *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

13. *Far N. Sanitation, Inc. v. Alaska Pub. Utils. Comm'n*, 825 P.2d 867, 871 n. 6 (Alaska 1992).

14. *Nat'l Bank of Alaska v. State, Dep't of Revenue*, 642 P.2d 811, 815 (Alaska 1982).

15. *Tlingit–Haida Reg'l Elec. Auth. v. State*, 15 P.3d 754, 761 (Alaska 2001).

16. *Far N. Sanitation*, 825 P.2d at 872 (quoting *New England Tel. & Tel. Co. v. Pub. Util. Comm'n*, 116 R.I. 356, 358 A.2d 1, 20 (1976)).

17. "Whether desired or not.... Being or occurring whether desired or not." An alteration of *"will ye, nill ye*, be you willing, be you unwilling." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 1320 (1988).

18. Krieger, *supra* note 1, at 1040.

19. *Far N. Sanitation*, 825 P.2d at 872.

20. *Alaska Pub. Utils. Comm'n v. Municipality of Anchorage*, 902 P.2d 783, 788 (Alaska 1995).

21. *In re Cen. Vermont Pub. Serv. Corp.*, 144 Vt. 46, 473 A.2d 1155, 1161 (1984).

The question before us is whether requiring Chugach to refund amounts collected in excess of the generation and transmission line loss factor constitutes impermissible retroactive ratemaking.

### B. The Rule Against Retroactive Ratemaking Applies to the Fuel Surcharge at Issue.

Chugach contends that the rule against retroactive ratemaking applies to the fuel surcharge here. MEA, as well as the commission, distinguish the fuel surcharges from regular commission-made rates, both arguing that, because of this distinction, fuel surcharges are not susceptible to the prohibition.

#### 1. The fuel surcharge constitutes a commission-made rate.

While Chugach maintains that the fuel surcharge for the generation and transmission line loss factor is a rate, MEA claims the surcharge is distinguishable from a rate. The commission concurs with MEA, arguing that fuel surcharges are distinct from actual rates because "unlike traditional rates which are estimates derived from historical costs and consumption adjusted to predict future costs and consumption, surcharges in Alaska are designed and administered to cover actual costs exactly."

"The difficulty in classification [for fuel surcharges] stems not only from the inflationary rise in fuel costs that triggered the problem, but from the fact that fuel cost adjustment clauses are themselves unique animals that are not easily assimilated to classical rate-making principles." [22]

Chugach draws a distinction in the case law regarding fuel surcharges that have been pre-approved by the relevant state's utilities commission from those where the fuel surcharge did not receive such review. In distinguishing between the two, Chugach notes that where the fuel surcharge received approval by the necessary authority before enactment, the court did not permit a retroactive refund of any excess rates, finding it constituted retroactive ratemaking. However-

er, where the utility's surcharge did not receive review, the court was more likely to find the rule against retroactive ratemaking did not apply, as the commission retained jurisdiction over the matter. MEA, however, argues that it is not whether the rates were reviewed that matters, but rather how much review they received. The question, therefore, is what type of review does the commission provide for fuel surcharge filings in Alaska and whether such review is adequate to consider a fuel surcharge a rate, applicable to the prohibition against retroactive ratemaking.

#### a. Fuel surcharges in Alaska receive a documentary review.

Chugach argues that the distinction between the instant case and those cases supporting the proposition that fuel surcharges are in a different category than rates is that the charges in this case were approved by the commission. MEA and the commission argue that the fuel surcharge filings utilized by Chugach only received ministerial review. Chugach's position is the more persuasive.

In their dissent from the commission's order denying reconsideration, Commissioners Alyce A. Hanley and James M. Posey wrote "[t]he argument that [Chugach's fuel surcharge] filings were only subject to a superficial review is disingenuous." The dissenters note that the filings received "extensive review." However, utility tariff analyst Dawn Bishop Kleweno affied that "[u]nder the present system, it is simply impossible to thoroughly investigate fuel surcharges like rates in a rate case."

Chugach used the simplified rate filing process to establish its base rates and argues that if the same review is given to fuel surcharge filings as to simplified rate filings, one cannot constitute a rate if the other does not. The processes are indeed similar. Chugach submitted the same amount of documentation for both its simplified rate filings as well as its fuel surcharge filings. Much of the same information is included in both processes. Both filings are made at least forty-five days before the rate takes effect and are subject

---

22. *Maine Pub. Serv. Co. v. Fed. Power Comm'n,* 579 F.2d 659, 668 (1st Cir.1978).

to investigation and possible suspension if the commission feels they need additional time for review.[23] Simplified rate filing rates are deemed final once they are approved.[24]

### b. The commission's review of Chugach's fuel surcharge is substantial enough to constitute a rate.

Despite the similarities between the simplified rate filing and fuel surcharge filing review processes, MEA and the commission claim their differences outweigh the similarities because the commission's review of the latter is purely ministerial. We disagree.

It is true that the fuel surcharge filing procedure is not the same as the simplified rate filing process in all respects. While the simplified rate filing applies to base rates, the fuel surcharge filing is for estimated costs such as line loss factors. Generally, there is no public notice regarding fuel surcharge filings. The commission also notes that generally there is also no hearing. Under AS 42.05.421, however, the commission does have the power to conduct a hearing upon its own motion "to determine the reasonableness and propriety of the filing."

The commission further argues that the analyst's duties, in reviewing a fuel surcharge filing, do not include investigating the underlying accuracy of information such as the line loss factor or meter read data, claiming the fuel surcharge filing is primarily reviewed "to verify the prior quarter's fuel costs ... unless something unusual stands out," and that, "[t]here simply is not enough time to investigate a utility's estimates for fuel costs and [kilowatt hour] sales prior to the next quarterly filing." While this may generally be true, in the present case MEA acknowledges that in 1987 the commission

issued an order in a contested general rate proceeding in which MEA itself was an intervenor, expressly finding it appropriate for Chugach to use a 5.219% line loss factor for its transmission losses. Thereafter, Chugach relied on this order, and the commission repeatedly approved the same figure for Chugach's line loss factor for a period of years without inquiring into why there was no fluctuation, something that could be considered "surprisingly unusual." And, although the balancing account rectifies other changes in price, the account cannot rectify the constant use of the wrong figure when it is not due to any actual costs, but instead human error.

■ The law supports this approach. "[T]he essential principle of the rule against retroactive ratemaking is that when the estimates prove inaccurate and costs are higher or lower than predicted, the previously set rates cannot be changed to correct for the error; the only step that the [commission] can take is to prospectively revise rates in an effort to set more appropriate ones."[25] As one court stated, "[t]ariffs are encompassed within the prohibition against retroactive ratemaking, particularly when, as in the present case, they share similarities with rate schedules."[26] Here, the similarities vastly outweigh any differences between the two. And, as the court stated in *First Hartford Corp. v. Central Maine Power Co.*,[27] "[w]hether or not the clauses were 'just, reasonable and otherwise lawful', as the Commission's orders recited, they functioned as rates, filed and approved in advance of their inclusion in customers' charges."[28] Thus, "[t]he time for challenging a fuel adjustment

---

**23.** AS 42.05.411(a); AS 42.05.421.

**24.** 3 AAC 48.730(a) provides, in part: "A cooperative's rate adjustment filing under 3 AAC 48.700–3 AAC 48.790 is governed by 3 AAC 48.280 and will become permanent at the end of the notice period described in AS 42.05.411 unless the commission suspends the filing in accordance with AS 42.05.421."

**25.** *Detroit Edison Co. v. Michigan Pub. Serv. Comm'n,* 416 Mich. 510, 331 N.W.2d 159, 164 (1982).

**26.** *Kansas Gas & Elec. Co. v. State Corp. Comm'n of the State of Kansas,* 14 Kan.App.2d 527, 794 P.2d 1165, 1171 (1990) (holding the state's commission and the utility bound by the original tariff until changed by further order of that commission).

**27.** 425 A.2d 174 (Me.1981).

**28.** *Id.* at 177.

rate is before the rate is approved by the Commission."[29]

Even if we were to agree with MEA and the commission and find that the amount of review the commission gave to the fuel surcharge filings was inadequate, we agree with the Wisconsin Supreme Court's reasoning in *Wisconsin Power & Light Co. v. Public Service Commission of Wisconsin*,[30] making the argument irrelevant.

In *Wisconsin Power & Light*, the public service commission for the state of Wisconsin determined that Wisconsin Power & Light imprudently administered a contract for coal causing the company to overcharge customers for electricity. Wisconsin Power & Light was therefore ordered to pay nine million dollars in penalties, an amount derived from the actual "overcharges." The case is similar to the instant case as one party there contended that the penalties were valid, because Wisconsin Power & Light "use[d] unreasonably high fuel costs" when calculating its rates.[31] It was thus argued that the commission was only responsible for reviewing the formula, not the numbers plugged into it.[32] Similarly here, the commission claims analysts are not responsible for investigating the numbers. The Wisconsin court rejected this argument, as do we. The commission had the power to review Chugach's filings each time they were submitted. The record shows that the amount of review given fuel surcharge filings is in dispute. As in *Wisconsin Power & Light*, however, the dispute is irrelevant. What is relevant is that the commission had full power to review additional data concerning Chugach's line losses and to reexamine its own determination that a 5.219% line loss factor was appropriate; yet neither the commission nor MEA questioned Chugach's continuing reliance on the approved line loss factor until 1997.

29. *Id.* at 181.

30. 181 Wis.2d 385, 511 N.W.2d 291 (1994).

31. *Id.* at 295.

32. *Id.*

33. *Elsberry v. Elsberry*, 967 P.2d 1004, 1006 & n. 3 (Alaska 1998).

The commission, which purportedly reviewed the filings, cannot now argue that proper review did not take place. Chugach requested approval of its surcharges before passing them through to its customers. The commission's duty to check submitted filings for accuracy is not excused; it has specific statutory authority to investigate and even suspend a utility's proposed filing prior to implementation.

### 2. Is the one-quarter limitation for true-ups prohibited by the rule against retroactive ratemaking?

In his order, Judge Michalski holds that "going back more than one quarter in the correction of a Cost of Power Adjustment constitutes retroactive rate making."

Whether or not true-ups should be limited to one quarter is not an issue raised in the points of appeal and is not seriously briefed by any party. We deem issues addressed only cursorily in briefs waived by the party.[33] Where an issue involves a question of law that is critical to a proper decision, it may be considered.[34] However, in the instant case, this question is best considered by the commission[35] and is not critical to our finding that any refund would be retroactive ratemaking. Accordingly, we decline to consider the allowable duration of the true-up period.

### 3. The commission's powers do not include the power to bypass the rule against retroactive ratemaking.

In this case, the commission approved each tariff establishing the quarterly fuel surcharge rate before that rate took effect. Chugach argues that, even if the commission had the general authority to change a commission-approved fuel sur-

34. *Vest v. First Nat'l Bank of Fairbanks*, 659 P.2d 1233, 1234 n. 2 (Alaska 1983).

35. *Cole v. Ketchikan Pulp Co.*, 850 P.2d 642, 647 (Alaska 1993) (remanding issue to Workers' Compensation Board because board had not previously considered it and because parties had not briefed or argued issue on appeal).

charge rate, it could not do so in the instant case as the procedure for revising the quarterly fuel surcharge rate is in the tariff itself.[36] MEA responds that the commission's actions here were valid under our previous case law, which stated that it has "whatever powers are expressly granted to it by the legislature or conferred upon it by implication as necessarily incident to the exercise of powers expressly granted."[37] We need not consider whether or not the commission's order violates the procedures established in the tariff, as we have already found any refund here would constitute retroactive ratemaking.

### 4. The evidence does not support the conclusion that Chugach knew that the actual line loss factor was below 5.219%.

 In its brief, MEA contends that a decision in Chugach's favor would allow Chugach to retain the benefit of an incorrect line loss factor and that Chugach knew the line loss factor was incorrect for several years and did not use this knowledge to correct the factor. MEA claims that when Myles C. Yerkes, a representative of the Alaska Electric Generation & Transmission Cooperative, met with Chugach he was provided line loss data for the 1995–1997 period. MEA then argues that "expressly set out in those documents, the actual ... line loss for those years was not 5.219%, but rather 3.64%, 2.61%, and 2.79%."

Chugach denies there is any evidence that it knew that the line loss factor it was using was incorrect. Although the documents MEA cites do set out line loss factors below 5.219%, it is not clear when these documents were generated. Also, Yerkes states in his affidavit that Chugach assumed the 5.219% rate "instead of calculating the actual value."

The assertion that Chugach had prior knowledge of the overstated line loss is not supported by the evidence.

**36.** Chugach thus argues that the commission's order violates four statutes in the utility code: AS 42.05.371, AS 42.05.411, AS 42.05.421, and AS 42.05.431.

## V. CONCLUSION

The prohibition against retroactive ratemaking applies to the generation and transmission line loss factor included in Chugach's fuel surcharge filing. We therefore AFFIRM the decision of the superior court that reversed the commission's order requiring Chugach to refund its wholesale customers amounts collected in excess of the actual line loss factor.

EASTAUGH, Justice, not participating.

**37.** *Glacier State Tel. Co. v. Alaska Pub. Utils. Comm'n,* 724 P.2d 1187, 1190 (Alaska 1986).