# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

=============================

## ON MOTION FOR REHEARING

=============================

## NO. 03-04-00731-CV

CenterPoint Energy Entex, Appellant

v.

Railroad Commission of Texas, Victor Carrillo, Elizabeth A. Jones,
Michael Williams, City of Tyler and State of Texas, Appellees [1]

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. GN402169, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion and judgment issued on February 24, 2006, and substitute this one in its place. We overrule the motions for rehearing filed by CenterPoint Energy Entex and by the City of Tyler.

This appeal presents a question of first impression: whether the Texas Railroad Commission (the Commission) may conduct a retroactive prudence review of charges flowed

---

[1] The State of Texas, separately from the Commission, intervened in this case and is represented by the consumer protection and public health division of the Office of the Attorney General. Hon. Elizabeth Ames Jones is successor in office to Hon. Charles R. Matthews, originally a party to this suit in his official capacity as a commissioner of the railroad commission. We have substituted Jones for Matthews as a party to this suit. *See* Tex. R. App. P. 7.2(a).

through a purchased gas adjustment clause (PGA clause) and order refunds of charges that the Commission finds the utility imprudently incurred. We must also consider whether such a review is a "ratemaking proceeding" in which a participating municipality is entitled to expense reimbursement. *See* Tex. Util. Code Ann. § 103.022 (West 1998). The Commission and the district court answered both questions in the affirmative. Because we find that the Commission has authority to conduct the review and order refunds but that such a review is not a "ratemaking proceeding," we affirm the order of the district court in part but reverse and render in part.

## BACKGROUND

Appellant CenterPoint Energy Entex[2] is a gas utility subject to the Gas Utility Regulatory Act. *See* Tex. Util. Code Ann. § 101.003(7) (West Supp. 2005); *see generally id*. §§ 101.001-105.051 (West 1998 & Supp. 2005) (GURA). For more than twenty-five years, Entex purchased gas on behalf of customers served by the Tyler Integrated Distribution System (TIDS) and charged customers under tariffs approved by the City of Tyler (the City), termed "rate schedules."[3] Since 1985, each of Entex's approved rate schedules included a "Purchased Gas Adjustment Provision" (PGA clause), an automatic escalator mechanism devised by utility regulators to deal with rapid fluctuations in the cost of natural gas. *See Railroad Comm'n of Tex. v. High Plains Natural*

---

[2] We refer to this entity as Entex, as it was known during the relevant events from which this appeal arose.

[3] Cities have exclusive original jurisdiction over natural gas rates in areas within the municipality while the Commission has the same over rates in areas outside of municipalities. *See* Tex. Util. Code Ann. §§ 102.001(a)(1)(A) & 103.001 (West Supp. 2005). A municipality can surrender its authority to the Commission. *Id*. §§ 102.001(a)(1)(B), 103.001, 103.003.

We have reproduced an example of one of the City-approved rate schedules at Appendix A.

2

*Gas Co.*, 613 S.W.2d 46, 48 (Tex. Civ. App.—Austin 1981), *writ ref'd n.r.e.*, 628 S.W.2d 753 (Tex. 1981) (per curiam). Such a clause operates to increase or decrease the revenue of the gas company by exactly the amount of its increased or decreased costs of gas charged the gas company by its suppliers. *Id.* (citing *City of Norfolk v. Virginia Elec. & Power Co.*, 90 S.E.2d 140 (Va. 1955)). Although Texas has never expressly addressed the use of PGA clauses in a statute, our courts have long approved of their use by regulators. *See San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 266-67 & n.2 (Tex. 1976); *High Plains Natural Gas Co.*, 613 S.W.2d at 48 (citing *City of Chicago v. Illinois Commerce Comm'n*, 150 N.E.2d 776 (Ill. 1958)); *Railroad Comm'n of Tex. v. City of Fort Worth*, 576 S.W.2d 899, 902 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.); *see also* Tex. Util. Code Ann. §§ 101.001-105.051 (no express recognition of PGAs).[4]

Since at least November 1992, Entex notified the City on a monthly basis regarding any gas cost changes that it would flow to its customers through the PGA clause. In some months, Entex reported no changes. In others, it informed the City of a change, either an increase or a decrease, and generally provided supporting information in the form of two Entex-generated documents stating the cost of gas purchased from several gas distributors and the effect those costs would have on the amounts charged to customers.

In 2002, the City began reviewing Entex's past customer gas charges, after which it informed Entex of "concerns" it had about the manner by which Entex purchased gas for resale to its customers. In particular, Entex had been acquiring its gas through two gas contracts, one with Texas GasMark, Inc. (TGM contract) and one with TXO Gas Marketing Corporation (TXO

_____

[4] We will discuss the nature of PGA clauses in more detail when we consider Entex's appellate issues.

3

contract). Both of the gas supplies purchased under each contract were "firm" (as opposed to interruptible), but the TGM contract price was significantly lower than the TXO contract price. It was alleged that Entex acted wrongfully by charging the higher priced gas to residential and small commercial customers while reserving the lower-priced gas for large commercial customers. The City believed that this procedure resulted in "overcharges" of about $39,000,000 to residential and small commercial customers because Entex had passed the higher-priced gas charges to those customers through the PGA clauses in Entex's filed rates. The City made further charges alleging that Entex had filed misleading tariffs, failed to request annual price redeterminations, and failed to charge non-Tyler customers for their proportionate share of Entex's capital costs. The City set the matter for consideration at a city council meeting.

Entex filed suit in Travis County district court seeking a declaration that the City lacked authority to order refunds and an injunction to prevent consideration of the issue at the city council meeting. Entex asserted that ordering refunds for gas distribution was within the exclusive jurisdiction of the Commission. *See* Tex. Util. Code Ann. § 104.005(c) (West 1998). Entex and the City agreed that Entex would dismiss its district court proceedings and that the parties would instead submit the issues directly to the Commission. In their "Joint Petition for Review of Charges for Gas Sales,"[5] the parties requested that

> the Commission initiate a proceeding to determine whether Entex has properly and lawfully charged and collected for gas sales to residential and commercial customers served from the TIDS during the period from November 1, 1992 to October 31, 2002,

---

[5] On January 8, 2003, the City, by ordinance, surrendered to the Commission its claimed jurisdiction over the matter. *See* Tex. Util. Code Ann. § 103.003 (West Supp. 2005).

4

to consider any appropriate remedies, including but not limited to, refunds, with interest, and to enter such orders as may be appropriate.

But the parties disputed what the Commission's review should entail. Entex urged that the Commission had power only to determine whether Entex "properly and lawfully charged and collected for gas sales to residential and commercial customers in Tyler as authorized under its tariffs and rate schedules" but that the Commission could not consider the prudence of Entex's gas purchases because that would constitute retroactive ratemaking. *See id*. § 104.151. Entex also maintained that the Commission should first consider the scope of its review authority before reaching the merits of the City's allegations. The City argued that the Commission could conduct a retroactive prudence review of Entex's gas purchases[6] and that the Commission should address in a single proceeding both the scope of its authority to review Entex's charges and to order refunds and the merits of the City's allegations. The City also requested that the Commission order Entex to reimburse the City for its expenses because it considered the proceeding to be a "rate case" as defined in the utilities code. *See id*. § 103.022 (West 1998). Entex responded that the case was not a "ratemaking proceeding" and, thus, the City was not entitled to recover its expenses. *See id*. § 103.022.

The Commission set the matter before two hearing examiners, who decided that "issues related to a consideration of the reasonableness and necessity of Entex's gas costs and gas

---

[6] The Commission's hearing examiners characterized the parties' positions thus: "Generally, the City of Tyler, on the one hand, argues that the proceeding includes a 'prudence review' of past purchases. On the other hand, Entex argues that the Commission lacks the authority to conduct a retroactive prudence review and that this case is limited to an audit of its gas costs flow through." (Footnotes omitted.).

5

purchase practices will be considered in this proceeding." The Commission denied Entex's appeal

of this decision. After a hearing on the merits, the hearing examiners rejected the City's argument

that any proceeding that affects the compensation of a utility is a ratemaking proceeding. Instead,

they decided that "ratemaking proceedings" are only those that are exclusively devoted to rates such

that they may result in changed rates. Thus, the examiners found that the City could not be entitled

to reimbursement for its expenses. On appeal, the Commission reversed that holding and awarded

the City 90 percent of its expenses.[7]

Entex then filed suit in Travis County district court seeking a declaration that the

Commission lacks authority to conduct a retroactive prudence review of gas purchases and,

alternatively, that such an action by the Commission is not a "ratemaking proceeding" in which the

City could obtain expense reimbursement. It also asked the district court to enjoin enforcement of

the Commission's order requiring Entex to reimburse the City 90 percent of its expenses. The

district court rendered judgment declaring that the Commission has authority to conduct a retroactive

prudence review of gas purchases and that such a proceeding is a ratemaking proceeding in which

the City could recover expenses. This appeal followed.[8]

---

[7] Commissioner Michael Williams dissented.

[8] After filing its petition in district court, Entex filed a petition for writ of mandamus requesting that this Court stay the Commission from engaging in its prudence review of Entex's gas purchases during the pendency of this appeal. We denied the petition. The parties report that the Commission has conducted its review, found that no refund was due, and severed from that proceeding the issue of the City's claim for rate case expense reimbursement. The Commission later denied the City reimbursement in the severed cause. Because this appeal continues to present live issues affecting matters still pending before the Commission, we proceed to consider them.

6

Entex brings two issues on appeal that mirror its issues before the district court—whether the Commission has authority to conduct a retroactive prudence review of gas purchases that Entex flowed through the PGA clauses and whether such a proceeding is a ratemaking proceeding for which the City can seek expense reimbursement.

**Standard of review**

Our consideration of Entex's appellate issues ultimately turns upon statutory construction. Statutory construction is a matter of law, which we review *de novo*. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). The goal of statutory construction is to give effect to the intent of the legislature. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999); *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994). We consider, among other factors, the language of the statute, legislative history, the nature and object the legislature intended to be obtained, and the consequences that would follow from alternative constructions, even when a statute is not ambiguous on its face. Tex. Gov't Code Ann. § 311.023 (West 1998); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001); *United Servs. Auto. Ass'n v. Strayhorn*, 124 S.W.3d 722, 728 (Tex. App.—Austin 2003, pet. denied). We consider disputed provisions in context, not in isolation. *Texas Workers' Comp. Comm'n v. Continental Cas. Co.*, 83 S.W.3d 901, 905 (Tex. App.—Austin 2002, no pet.); *see Fitzgerald v. Advanced Spine Fixation Sys.*, 996 S.W.2d 864, 866 (Tex. 1999).

The legislature has instructed us that GURA is to "be construed liberally to promote the effectiveness and efficiency of regulation of gas utilities." Tex. Util. Code Ann. § 101.007 (West

7

1998).  However, as an administrative agency, the Commission may exercise only those powers that the legislature confers upon it in clear and express language and cannot create and exercise what really amounts to a new or additional power for the purpose of administrative expediency.  *Texas Natural Res. Conservation Comm'n v. Lakeshore Util. Co.*, 164 S.W.3d 368, 377 (Tex. 2005); *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 316 (Tex. 2001).  This is because as an administrative agency the Commission is a creature of the legislature with no inherent authority of its own.  *Lakeshore Util. Co.*, 164 S.W.3d at 377.  "When the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its express functions or duties."  *Id*. at 378.  And, an agency created to centralize expertise in a certain regulatory area is ordinarily "given a large degree of latitude in the methods it uses to accomplish its regulatory function."  *Texas Mun. Power Agency v. Public Util. Comm'n*, 150 S.W.3d 579, 586 (Tex. App.—Austin 2004, pet. granted).  However, an agency may not, in the guise of implied powers, exercise what is effectively a new power, or a power contrary to a statute, on the theory that such exercise is expedient for the agency's purpose, *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 441 (Tex. 2002), nor may it contravene specific statutory language, run counter to the general objectives of the statute, or impose additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions.  *State v. Public Util. Comm'n of Tex.*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied).

**Retroactive prudence review of gas purchases**

In its first issue, Entex argues that the Commission lacks authority to conduct retroactive prudence reviews of gas purchase charges flowed through a PGA clause or to order

refunds. It also asserts that such a review that might result in a refund order violates the filed rate doctrine and is a form of prohibited retroactive ratemaking.

### *Regulatory and policy context*

We begin by recognizing that the legislature to date has continued to impose a comprehensive regime of traditional rate regulation on gas utilities. Gas utilities are monopolies in the areas they serve. Tex. Util. Code Ann. § 101.002(b) (West 1998). As a result, "the normal forces of competition that regulate prices in a free enterprise society do not operate." *Id*. Instead, the legislature sought through GURA "to establish a comprehensive and adequate regulatory system for gas utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities," with the overarching goal of protecting "the public interest inherent in the rates and services of gas utilities." *Id*. § 101.002(a). To this end, the legislature charged the Commission with the task of ensuring "compliance with the obligations of gas utilities" in GURA and granted the Commission broad powers to regulate "utility rates, operations, and services *as a substitute for competition*." *Id*. § 104.001 (emphasis added). The legislature emphasized that the Commission "shall ensure that each rate a gas utility or two or more gas utilities jointly make, demand, or receive is just and reasonable" in a manner that will "permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses." *Id*. § 104.003. These policy goals inform our analysis of the Commission's powers here. *See id*. § 101.007; *compare with TXU Generation Co., L.P. v. Public Util. Comm'n of Tex.*, 165 S.W.3d 821, 851-52 (Tex. App.—Austin 2005, pet. filed) (Pemberton, J., dissenting) (arguing that PURA's competition statutory objectives

9

should inform our view of the Commission's general powers to ensure both "safe, reliable, and reasonably priced electricity" in retail market and that ancillary services are available at "reasonable prices").

### PGA clauses

We next note the nature and function of PGA clauses.[9] Fuel adjustment clauses for utilities, such as the PGA clauses at issue in this case, originated as part of utility rate schedules in response to the rapid changes in coal prices during World War I. Richard J. Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry*, 97 Harv. L. Rev. 345, 373 (1983). They allow a utility to adjust charges automatically, either up or down, on an ongoing basis in response to fluctuating fuel costs. Dennis Schiffel, *Electric Utility Regulation: An Overview of Fuel Adjustment Clauses*, 95:13 Pub. Util. Fort. 23, 23-24 (1975); R.S. Trigg, *Escalator Clauses in Public Utility Rate Schedules*, 106 U. Pa. L. Rev. 964, 964 (1958). In other words, an automatic fuel adjustment clause is "a fixed rule under which future rates to be charged the public are determined. It is simply an addition of a mathematical formula to the filed schedules of the Company under which the rates and charges fluctuate as the wholesale cost of gas to the Company fluctuates." *City of Norfolk*, 90 S.E.2d at 148; *see also Louisiana Pub. Serv. Comm'n v. Federal Energy Regulatory Comm'n*, 688 F.2d 357, 360-61 (5th Cir. 1982).

---

[9] We do so while mindful of the admonition that a "lawyer who attempts to chop his way around in the jungle of legal opinion on the subject of these [PGA] clauses is apt to find himself wandering in circles with his intellectual machete so dulled he is soon brought to a standstill." Philip P. Ardery, *Should There Be Rules about Escalator Clauses?*, 53:1 Pub. Util. Fort. 35, 39 (1954).

Other cost components of rate schedules are generated from historically based projections of future costs and so are reflected in fixed components of the rate schedule.[10] *See* Pierce, 97 Harv. L. Rev. at 373. Although sometimes criticized, this bifurcated regulatory treatment is generally deemed satisfactory because most costs tend to increase gradually and predictably while fuel costs are particularly subject to dramatic and unforeseeable changes.[11] *Id*. at 373 n.152. In addition, fuel costs constitute such a large proportion of a utility's total costs that any substantial regulatory lag[12] in approving rate increases to reflect fuel cost increases can cause the rapid financial

---

[10] In the sample rate schedule reproduced as Appendix A, fixed-cost and variable-cost portions of the schedule are reported together under the heading "Net Monthly Rate." Some courts have termed these numbers as the "base rate," which fluctuates based on changes in the gas-cost variable as described in the PGA clause. *See, e.g., Southern Cal. Edison Co. v. Public Util. Comm'n*, 576 P.2d 945, 954-55 (Cal. 1978).

[11] Pierce has asserted that escalator clauses, such as the PGA clauses in this case, "are essential to the financial viability of many pipelines and other utilities." Richard J. Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry*, 97 Harv. L. Rev. 345, 373 (1983). Nonetheless, criticism has been voiced against the use of such clauses because of their automatic nature. *See* G. William Fowler, *Purchased Gas Adjustment Clauses: An Adjuster's Viewpoint*, 6 St. Mary's L.J. 567, 578-81 (1974) (reviewing major areas of criticism of fuel adjustment clauses, including incentive issues and parent-subsidiary self-dealing considerations).

[12] "Regulatory lag" is the loss of earnings between the time a utility files a petition for a rate increase and when the rate relief actually becomes effective. Pierce, 97 Harv. L. Rev. at 360; *see* R.S. Trigg, *Escalator Clauses in Public Utility Rate Schedules*, 106 U. Pa. L. Rev. 964, 964 (1958); *see also* Elizabeth Warren, *Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do They Increase or Decrease Cost to the Consumer?*, 55 Notre Dame L. Rev. 333, 348 (1980) ("Regulatory lag simply operates as a squeeze on the utility.").

ruin of an otherwise healthy utility.[13]  *Id.*  PGA clauses permit fluctuations in the utility's costs to

be passed through directly to its customers as cost adjustments in subsequent utility bills.  Elizabeth

Warren, *Regulated Industries' Automatic Cost of Service Adjustment Clauses: Do They Increase or*

*Decrease Cost to the Consumer?*, 55 Notre Dame L. Rev. 333, 336 (1980).  Through a PGA clause,

then, a utility can track its customer charges more closely to its current cost of fuel without

continually having to file for rate increases (or decreases) and ameliorate the regulatory lag problem.

*See Public Serv. Co. of N. H. v. Federal Energy Regulatory Comm'n*, 600 F.2d 944, 947 (D.C. Cir.

1979); *Gulf Power Co. v. Florida Public Serv. Comm'n*, 487 So. 2d 1036, 1037 (Fla. 1986).

Generally, implementation of PGA clauses is an exercise by a regulatory commission

of its ratemaking, as opposed to rulemaking, power, and PGA clauses are generally adopted in a

ratemaking proceeding as an integral part of a utility's overall rate structure.  *See Public Serv. Co.*

*of N. H.*, 600 F.2d at 947 (describing such clauses as part of "utility's filed rate"); *Scates v. Arizona*

---

[13] Four pragmatic justifications have generally been identified for using such clauses:

> (1) to reduce the number of rate proceedings and the expenses attended thereon, (2) a series of smaller increases to the consumer, (3) improved financial stability for the utility by reducing the variations in earnings caused by such increase in expenses, and as a result (4) a somewhat reduced cost of capital which ultimately would accrue to the benefit of the consumer.

Patricia Gabel, et al., *Utility Rates, Consumers, and the New York State Public Service Commission*, 39 Alb. L. Rev. 707, 754 (1975); *see Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp.*, 612 So. 2d 7, 22 n.23 (La. 1993); *see also Railroad Comm'n of Tex. v. City of Fort Worth*, 576 S.W.2d 899, 902 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.) (citing *Montana Consumer Counsel v. Public Serv. Comm'n*, 541 P.2d 770 (Mont. 1975)); Fowler, 6 St. Mary's L.J. at 578.

*Corp. Comm'n*, 578 P.2d 612, 616 (Ariz. 1978); *In re Petition of Allied Power & Light Co.*, 321 A.2d 7, 10-11 (Vt. 1974); Trigg, 106 U. Pa. L. Rev. at 996. In some jurisdictions, regulatory commissions are statutorily authorized to implement such clauses; in others, the regulatory commission implements such clauses pursuant to its plenary ratemaking authority. *See Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp.*, 612 So. 2d 7, 23 (La. 1993). As already noted, such clauses have been judicially recognized and approved in Texas, and we have also described the adoption of a PGA as being part of a ratemaking proceeding. *San Antonio Indep. Sch. Dist.*, 550 S.W.2d at 266-67 & n.2; *High Plains Natural Gas Co.*, 613 S.W.2d at 48; *City of Fort Worth*, 576 S.W.2d at 902.

### *Entex's approved rate and its PGA clause*

We next consider the relationship between the PGA clause here and Entex's approved rate. GURA defines a "rate" as

   (A)  any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a gas utility for a service, product, or commodity described in the definition of gas utility in this section; and

   (B)  a rule, regulation, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification.

Tex. Util. Code Ann. § 101.003(12) (West Supp. 2005). Through this language, the legislature has recognized that a rate may consist not merely of a fixed dollar amount but may instead be a rule "affecting" the charge, a term contemplating the use of variables. *See id*. § 101.003(12)(B).

The approved rate schedules in this case amount to a rule providing a three-step process for computing a customer's monthly gas charge.[14] *See id*.; *see also* Appendix A. First, the rate schedule sets each customer a minimum monthly bill, $9.19. Second, the rate schedule defines the price of gas per 100 cubic feet of gas.[15] Collectively, these prices may be termed the "base rate" because they set the base from which the actual customer charge will vary according to the terms of the third part of the rate schedule, the PGA clause. The third component, the PGA clause, states that the "net monthly rate per unit sold is predicated upon a price of natural gas purchased for resale" at $4.5705 per Mcf.[16] As a result, the actual customer charge for gas would be the amount set by the base rate, adjusted for the deviation of the cost of gas to Entex from the assumed purchase price of $4.5705 per Mcf.

This "rule" fits squarely within the statutory definition of "rate." *See* Tex. Util. Code Ann. § 101.003(12)(B). We thus conclude that an Entex gas rate consists of its entire rate schedule, which may result in differing customer charges month-to-month. *See* 16 Tex. Admin. Code § 7.315(a), (c)(8) (2005) (formula may constitute rate; rate adjustment provision must be part of rate filing); *cf. ChevronTexaco Exploration & Prod. Co. v. Federal Energy Regulatory Comm'n*, 387

---

[14] For the sake of simplicity, we refer only to the terms and numbers used in the sample rate schedule reproduced at Appendix A.

[15] The price of gas is divided into four brackets: for the first 400 cubic feet of gas, the customer is charged a set price of $9.19 (the minimum monthly bill); the next 2,600 cubic feet cost $.6536 per 100 cubic feet; the next 7,000 cubic feet cost $.5412 per 100 cubic feet; and, finally, any amount of gas more than the initial 10,000 cubic feet will cost the customer $.5208 per 100 cubic feet.

[16] The PGA clause also includes a provision for the amount charged to vary according to changes in gross receipts taxes, a practice that has been common in jurisdictions that permit the use of PGA clauses. *See* Trigg, 106 U. Pa. L. Rev. at 982-87.

F.3d 892, 895 (D.C. Cir. 2004) (quoting *Transwestern Pipeline Co. v. Federal Energy Regulatory Comm'n*, 897 F.2d 570, 578 (D.C. Cir. 1990)) (under Federal Natural Gas Act, FERC may approve "a tariff containing a rate 'formula' or a rate 'rule'" instead of a specific number); Pierce, 97 Harv. L. Rev. at 349 n.29 (rates generally may consist of fixed values and variable components).

### The Commission's authority over the rate

The regulatory authority, whether the Commission or a municipality, "shall ensure that each rate a gas utility or two or more gas utilities jointly make, demand, or receive is just and reasonable." Tex. Util. Code Ann. § 104.003 (West 1998). Rates must be established so as to permit the utility "a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses." *Id*. §§ 104.051, .053. "A gas utility may not directly or indirectly charge, demand, collect, or receive from a person a greater or lesser compensation for a service provided or to be provided by the utility than the compensation prescribed by the applicable schedule of rates filed." *Id*. § 104.005. Finally, the Commission "may require the examination and audit of the accounts of a gas or municipally owned utility" and may inspect "the papers, books, accounts, documents, and other business records of a gas utility within its jurisdiction." *Id*. §§ 102.202, .203.

The utilities code does not define "examination" or "audit," so we may rely on definitions listed in commonly used dictionaries to discern the plain meaning of terms in the statute. *See Powell v. Stover*, 165 S.W.3d 322, 326 (Tex. 2005); *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 196 (Tex. 2004); *Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 695 n.8 (Tex. App.—Austin 2005, pet. filed). An "examination" is "an inspection" or

"analysis." *American Heritage Dictionary* 456 (1973). An audit is a "formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards." *Black's Law Dictionary* 126 (7th ed. 1999). It may involve "an adjustment or correction of accounts." *American Heritage Dictionary* 86.

The legislature has charged the Commission to ensure "compliance with the obligations of gas utilities" in GURA and to regulate "utility rates, operations, and services as a substitute for competition," Tex. Util. Code Ann. § 104.001, and has specifically enumerated its power to conduct examinations and audit the utilities. *Id.* §§ 102.202, .203. The PGA clause, as part of the rate, is an important and varying factor in the charge to the utilities' customers, and the amount charged to customers ultimately depends, under the terms of the PGA clause, on the price of gas purchased. PGA clauses are merely recoupment devices designed to permit utilities a dollar-for-dollar recovery of fluctuations in fuel costs. The customer is harmed by the implementation of such clauses only if such clauses are manipulated or abused, thus encouraging the promulgation of rate charges that are neither just nor reasonable to the ratepayer. *See* Fowler, 6 St. Mary's L.J. at 578-81; *see also In re Niagara Mohawk Power Corp.*, 507 N.E.2d 287, 291 (N.Y. 1987). These criticisms are met, however, when the regulatory body reviews charges recouped by a utility through a PGA clause and determines that such charges were "just and reasonable." A necessary corollary to such review is the power to take corrective action when the utility has misapplied the terms of its rates. In other words, an allegation that a utility has manipulated its purchases to artificially raise the cost of fuel differs in no substantial way from the claim that a utility charged customers a price greater than an approved fixed rate. As the Ohio Supreme Court

16

observed, "the requirement of fairness which compels adjustment in rates to compensate utilities for escalating fuel costs also compels retrospective reconciliation to exclude charges identifiably resulting from unreasonable computations or inclusions." *Ohio Power Co. v. Public Utils. Comm'n*, 376 N.E.2d 1337, 1338-39 (Ohio 1978).

In response, Entex points out that although GURA and PURA share a common legislative history, the legislature gave the Commission express authority in PURA to review and reconcile the prudence of the fuel costs of *electric* utilities, *see* Tex. Util. Code Ann. § 36.203 (West 1998), yet included no such provision in GURA regarding gas utilities. Entex would have us infer that the legislature did not intend to empower the Commission to review and reconcile gas utilities' fuel costs. However, the legislature enacted the provision granting the Commission authority to review and reconcile the prudence of fuel costs at a time when it had prohibited the PUC from allowing electric utilities to use automatic fuel cost adjustment clauses like PGAs. *Id*. § 36.201 (West 1998); *see also Entergy Gulf States, Inc. v. Public Util. Comm'n of Tex.*, 173 S.W.3d 199, 206 (Tex. App.—Austin 2005, pet. filed). By contrast, Texas courts by that time had approved the use of PGA clauses by gas utilities. *See High Plains Natural Gas Co.*, 613 S.W.2d at 48. Against this legal backdrop, the legislature understandably provided a method for timely review and adjustment of an electric utility's fuel costs as an alternative for fuel factor adjustment clauses while including no such provision regarding gas utilities. *See* Tex. Util. Code Ann. § 36.203(d). Thus, we find uninstructive Entex's comparison with the express powers given to the PUC.

As we have discussed, when a PGA clause is approved, the power to review past purchases and order refunds is necessary to ensure compliance with the approved rate. We find it

17

reasonably necessary for the Commission to have the power to review past gas purchases and order refunds as part of its express audit power to ensure compliance with the approved rate and its implied power to approve PGA clauses. *See id.* §§ 104.005(a), (c) (Commission may order refund with interest if it finds that utility violated terms of its filed rate); *see also City Pub. Serv. Bd.*, 53 S.W.3d at 316 (Tex. 2001); *Lakeshore Util. Co.*, 164 S.W.3d at 378. Otherwise, the Commission's authority would be reduced to the ministerial task of verifying the utility's arithmetic, and having the general powers to regulate rates and *ensure compliance* together with the jurisdiction to examine and audit the utilities would "be hollow and meaningless." *See Texas Bldg. Owners & Managers Ass'n v. Public Util. Comm'n of Tex.*, 110 S.W.3d 524, 532 (Tex. App.—Austin 2003, pet. denied); *Public Util. Comm'n of Tex. v. City of Austin*, 728 S.W.2d 907, 915 (Tex. App.—Austin 1987, writ ref'd n.r.e.); *see also In re Redi-Flo Corp.*, 384 A.2d 1086, 1097 (N.J. 1978) (court could not be satisfied that PGA clause itself was "just and reasonable" if clause operated free from regulatory board's supervision and without periodic systematic review more comprehensive than "monitoring").

### *Filed rate doctrine*

Entex next argues that the power to conduct a retroactive prudence review violates the filed rate doctrine. We disagree.

The "filed rate doctrine" applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided. *Arkansas La. Gas Co. v. Hall*, 453 U.S. 571, 579 (1981); *Keogh v. Chicago & Northwestern Ry.*, 260 U.S. 156, 163 (1922); *see also* Tex. Util. Code Ann. § 104.005(a) (codifying filed rate doctrine). The doctrine holds that a tariff filed with and approved by an administrative agency under a statutory scheme is

presumed reasonable unless a litigant proves otherwise. *Southwestern Elec. Power Co. v. Grant*, 73 S.W.3d 211, 216 (Tex. 2002). It concomitantly prohibits regulated utilities from "charging rates for their services other than those properly filed with the appropriate regulatory authority." *Entex v. Railroad Comm'n of Tex.*, 18 S.W.3d 858, 862-63 (Tex. App.—Austin 2000, pet. denied) (quoting *Southwestern Bell Tel. Co. v. Metro-Link Telecom, Inc.*, 919 S.W.2d 687, 692 (Tex. App.—Houston [14th Dist.] 1996, writ denied)). A tariff filed with and approved by an administrative agency under a statutory scheme is presumed reasonable unless a litigant proves otherwise. *Grant*, 73 S.W.3d at 216; *see Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 572 (1921); *Wegoland, Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994); *Metro-Link Telecom*, 919 S.W.2d at 691. Thus, under the doctrine filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside. *Grant*, 73 S.W.3d at 217; *see Keogh*, 260 U.S. at 162-63; *Carter v. AT&T Co.*, 365 F.2d 486, 496 (5th Cir. 1966); *Metro-Link Telecom*, 919 S.W.2d at 692. Additionally, regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority. *Maislin Indus. v. Primary Steel, Inc.*, 497 U.S. 116, 126 (1990); *Arkansas La. Gas*, 453 U.S. at 577; *Metro-Link Telecom*, 919 S.W.2d at 692. A utility's obligations to its customers cannot exceed its duties under the filed tariff. *See Texaco, Inc. v. Central Power & Light Co.*, 955 S.W.2d 373, 377 (Tex. App.—San Antonio 1997, pet. denied); *Central Power & Light Co. v. Romero*, 948 S.W.2d 764, 767 (Tex. App.—San Antonio 1996, writ denied); *see also Arkansas La. Gas*, 453 U.S. at 577-78.

The considerations underlying the doctrine are the preservation of the regulatory agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the regulatory agency has been made cognizant. *See Concord v. Federal Energy Regulatory Comm'n*, 955 F.2d 67, 71 (D.C. Cir. 1992); *City of Cleveland v. Federal Power Comm'n*, 525 F.2d 845, 854 (D.C. Cir. 1976). In addition, the doctrine serves to provide predictability and certainty to enable customers to make decisions according to the rates as approved and "the cost of what they are receiving." *Electrical Dist. No. 1 v. Federal Energy Regulatory Comm'n*, 774 F.2d 490, 493 (D.C. Cir. 1985); *cf. Indiana & Michigan Elec. Co. v. Federal Power Comm'n*, 502 F.2d 336, 344 (D.C. Cir. 1974). A regulatory agency cannot retroactively alter the cost-adjustment mechanism, nor can it reject calculations on the theory that the method of calculation itself is not just or reasonable, because the rate rule is the filed rate. *See, e.g., ChevronTexaco*, 387 F.3d at 896. However, the filed-rate doctrine does not preclude a review based on the charge that a utility misapplied its rate. *See East Tenn. Natural Gas Co. v. Federal Energy Regulatory Comm'n*, 631 F.2d 794, 800 n.10 (D.C. Cir. 1980).[17]

---

[17] In *East Tennessee*, the gas supplier had tariffs that included a fixed demand charge (entitling the purchaser to minimum amounts each day) and a "commodity charge" (an amount based on the actual amount received). *East Tenn. Natural Gas Co. v. Federal Energy Regulatory Comm'n*, 631 F.2d 794, 797 (D.C. Cir. 1980). Due to shortages, the supplier began to curtail delivery of gas and was unable to meet its minimum amount obligations (as promised under the demand charge provision). *Id.* The supplier thus gave its customers, as termed by the D.C. Circuit, "demand charge credits." *Id.* To recover this loss, it also added a surcharge to its commodity charge, thereby allowing the supplier to recoup all its revenue lost through the demand charge credit. *Id.* East Tennessee invoked its PGA clause to pass through the surcharge to its customers but did not factor in the demand charge credit. *Id.* FERC ordered the demand charge also passed though. *Id.* at 798. However, the substance of the dispute before FERC was the nature of the credit. *Id.* at 797 n.6. East Tennessee argued that they were "curtailment credits," a position FERC rejected. *Id.* Thus, the review at issue in the case was the proper characterization of the credit themselves. Only after

20

As we have explained above, the Commission's authority to conduct a retroactive review of gas purchases does not involve retroactively changing the terms of Entex's approved rate schedule. Instead, the Commission is attempting to review gas purchases that resulted in changes to the amounts charged to Entex's customers under the terms of its PGA clause. The City's underlying claim, the basis for the Commission's action, amounts to one of abuse of the PGA clause, a variable in Entex's approved rate; the proceedings concern the alleged misapplication of Entex's rates rather than an attempt to change the terms of the rates. In other words, the Commission's review is not an attempt to order Entex to calculate its charges differently; rather, it would be ordering Entex only to calculate its charges correctly. Thus, we conclude that the filed rate doctrine does not prevent regulatory review of allegedly imprudent expenditures automatically passed through to the ratepayers through a PGA clause.

### Rule against retroactive ratemaking

Finally, Entex argues that the authority to conduct a retroactive review of gas purchases would violate the rule against retroactive ratemaking. We disagree.

---

determining *how* to characterize the credits (as demand charge credits instead of as "curtailment credits") did FERC, and then the D.C. Circuit, consider whether the refund violated the filed rate doctrine. In this way, FERC first conducted a review of the underlying transactions, to determine the nature of the transactions and, after making that determination, only then engaged in the application—calculating the correct charge.

Similarly, the central allegation in this case is the circumstances of Entex's gas purchases and sales—that it charged its residential and small commercial customers for the wrong gas. The Commission is seeking to review which purchased gas was the correct one for delivery to the residential and small commercial customers. Once it does that, it will engage in the ministerial task of calculating the correct charge.

Fundamental in the utility ratemaking process is the principle, termed the rule against retroactive ratemaking, that utility rates are set for the future and not the past. *Railroad Comm'n of Tex. v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex. 1983). Utilities code sections 104.110 and 104.151 codify the rule against retroactive ratemaking for gas rates. Rates set by the Commission "constitute the legal rates of the gas utility until changed" in the manner provided by GURA. Tex. Util. Code Ann. § 104.151(b). If, after a hearing, the Commission finds a rate unreasonable, it shall "enter an order establishing the rates the gas utility shall charge or apply for the service in question." *Id*. § 104.110(a)(1). The new rate "shall be observed thereafter until changed." *Id*. § 104.110(b).

The rule against retroactive ratemaking is often misunderstood and misapplied. *See State v. Public Util. Comm'n of Tex.*, 883 S.W.2d 190, 199 (Tex. 1994) (citing Stefan Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings*, 1991 U. Ill. L. Rev. 983, 988 (1991)). It prohibits a public utility commission from setting future rates to allow a utility to recoup past losses or to refund to consumers excess utility profits. *Id*. "Restated, the rule prohibits a utility commission from making a retrospective inquiry to determine whether a prior rate was reasonable and imposing a surcharge when rates were too low or a refund when rates were too high." *Id*. That is, the rule against retroactive ratemaking only requires that natural gas companies, the Commission, and courts abide by an administrative determination that a particular rate is just and reasonable. *See East Tenn. Natural Gas Co.*, 631 F.2d at 800.

The Commission's attempt to review Entex's gas purchases, which directly affected the amounts charged to Entex's customers, and to order refunds to compensate for allegedly

22

imprudent purchases may well be retroactive in effect, but it is not retroactive ratemaking. As we have already discussed, the Commission is not attempting to disturb the determination that Entex's rate schedules are just and reasonable. Rather, the Commission's review will only concern its application of the approved rates—having been given the benefit of including PGA clauses in its rates, Entex will be subject to review of gas purchases to ensure that it did not misapply its filed rate schedule. The Commission is not modifying the rate.

The rule against retroactive ratemaking does not prohibit the Commission from ordering a utility to honor its rate schedule when the rate schedule itself includes a variable term.[18] A customer charge determined by the application of a PGA clause cannot be declared reasonable or just until after it has been implemented. Thus, a regulatory agency can identify overcharges only through retrospective analysis. As the D.C. Circuit explained when considering a similar problem under the Federal Natural Gas Act, "The allegedly retroactive changes here are not retroactive at all; they simply implement an existing rate system that requires periodic adjustments." *East Tenn. Natural Gas Co.*, 631 F.2d at 800 n.9; *see also Concord*, 955 F.2d at 75; *Boston Edison Co. v. Federal Energy Regulatory Comm'n*, 856 F.2d 361, 370 (1st Cir. 1988).

Entex offers two cases from other states to support its argument that the power to order refunds after conducting retroactive review of gas purchases violates the rule against retroactive ratemaking. *See Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 53 P.3d 578 (Alaska

---

[18] The rule against retroactive ratemaking generally protects the utility from being subject to later decisions by a regulatory agency that the agency's earlier decision in approving a rate was "unsound." *See Public Util. Comm'n of Cal. v. Federal Energy Regulatory Comm'n*, 894 F.2d 1372, 1383 (D.C. Cir. 1990). In the context of PGA clauses, this reasoning cannot apply—no regulatory authority has ever considered the circumstances under which Entex made its gas purchases.

23

2002); *Wisconsin Power & Light Co. v. Public Serv. Comm'n of Wis.*, 511 N.W.2d 291 (Wis. 1994). *Matanuska* concerned a fuel surcharge included as an *estimate* in its rate, subject to quarterly true-up proceedings. 53 P.3d at 581. Variances between the estimated and actual costs were taken into account when calculating the next quarterly fuel surcharge filing. *Id*. Part of its fuel surcharge estimate included a line-loss estimate to account for the amount of energy lost through the process of generation and transmission. *Id*. Chugach had used a 5.219% line loss factor in its rate filings with the regulatory agency, but later review revealed that its own internal documents showed the actual line loss factor to be substantially lower. *Id*. at 582. Chugach corrected its error when filing future tariffs but refused to issue refunds. *Id*. The Alaska Supreme Court held that, when initial estimates are later shown to be inaccurate, previously set rates cannot be changed to correct for the error. *Id*. at 585. It found confirmation in that approach because of the extensive review the regulatory agency employed when setting the rate and accepting the line loss factor. *Id*. *Chugach* does not aid our analysis here; we are not considering an estimate later found to be inaccurate, a number that could have been verified before implementation, but the prudence of gas purchases, which were not readily subject to review until after they occurred.

In *dicta*, the *Matanuska* court relied on *Wisconsin Power & Light*, a case that considered fuel adjustment clauses contained in wholesale electricity rates. *Id*. at 586 (reviewing *Wisconsin Power & Light*, 511 N.W.2d at 295-97). The Wisconsin Supreme Court held that ordering a refund for imprudent fuel purchases violated the rule against retroactive ratemaking. *Wisconsin Power & Light*, 511 N.W.2d at 297. In part, the court found that the regulatory authority actually had performed audits during the period subject to later review and so could not revisit its

determination in later proceedings. *Id*. at 296. The agency had, in fact, often approved rates on interim bases so that it could review fuel costs and order refunds after that review. *Id*. As a result, the court held that, having "approved [the utility's] rates, including the utility's expected coal costs, 14 times, the [agency] cannot now claim that the [utility] must return this money." *Id*. at 297.

*Wisconsin Power & Light* differs significantly from this case. Entex's PGA clause was approved as part of its rate. As fuel costs changed, sometimes as frequently as every month, there was no requirement to receive approval from a regulatory authority to alter the amount charged to customers. Instead, the charges changed according to the terms of the filed rate.

To the extent that *Wisconsin Power & Light* could be interpreted broadly as prohibiting as retroactive ratemaking in Wisconsin any refund based on a review of fuel purchase costs passed through to customers through fuel adjustment clauses, we decline to adopt that reasoning here. Instead, we find persuasive the dissenting opinion to that case, arguing that, because "rates calculated under the fuel adjustment clause go into effect without advance approval by the [regulatory agency], the utility cannot validly expect that charges thus collected are insulated from retroactive modification."[19] *Id*. at 299 (Abrahamson, J., dissenting). Many other courts have reached similar conclusions.[20] We have concluded that the proper characterization of the Commission's

---

[19] As the Rhode Island Supreme Court has observed, the "specter of retroactive ratemaking must not be viewed as a talismanic inhibition against the application of principles based upon equity and common sense." *Roberts v. Narragansett Elec. Co.*, 470 A.2d 215, 217 (R.I. 1984))

[20] *See Fitchburg Gas & Elec. Light Co. v. Department of Telecomms. & Energy*, 801 N.E.2d 220, 230-31 (Mass. 2004); *Daily Advertiser v. Trans-La, Div. of Atmos Energy Corp.*, 612 So. 2d 7, 23 (La. 1993); *MGTC Inc. v. Public Serv. Comm'n of Wyo.*, 735 P.2d 103, 107 (Wyo. 1987); *Equitable Gas Co. v. Pennsylvania Pub. Util. Comm'n*, 526 A.2d 823, 830-31 (Pa. Commw. Ct. 1987); *Gulf Power Co. v. Florida Pub. Serv. Comm'n*, 487 So. 2d 1036, 1037 (Fla. 1986); *Public Serv. Comm'n of Md. v. Delmarva Power & Light Co.*, 400 A.2d 1147, 1153 (Md. Ct. Spec. App.

review recognizes that increased consumer charges resulting from gas purchases were not products of ratemaking. We therefore hold that they cannot be rendered inviolable by the rule against retroactive ratemaking.[21]

### *Conclusion concerning retroactive reviews of gas purchases*

After careful review of Entex's arguments, we have concluded that the Commission's claimed authority to conduct retroactive reviews of gas purchases and to order refunds has statutory support and does not violate either the filed rate doctrine or the rule against retroactive ratemaking. We overrule Entex's first issue.

## Expense reimbursement

In its second issue, Entex argues that retroactive review of its gas purchases is not a "ratemaking proceeding" in which the Commission could require it to reimburse the City for its costs for participating in the review. *See* Tex. Util. Code Ann. § 103.022. We agree.

---

1979); *Southern Cal. Edison Co. v. Public Util. Comm'n*, 576 P.2d 945, 954-55 (Cal. 1978).

[21] Entex appears to make an additional argument—that the period to be subject to review is not limited in a way that will pass constitutional muster concerning its vested rights in the approved rates. *See* Tex. Const. art. I, § 16; *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.*, 615 S.W.2d 947, 956-57 (Tex. App.—Austin 1981), *writ ref'd n.r.e.*, 622 S.W.2d 82 (Tex. 1981). Thus, Entex argues, the Commission's review cannot function as an exception to the rule against retroactive ratemaking. We emphasize that our holding here is that the rule does not apply to retroactive review of gas purchase costs under a PGA clause. The Commission's review is therefore not an "exception" to the rule. In any event, Entex did not present this as-applied vested-rights challenge to the Commission, and we will not consider it on appeal. *See Texas Water Comm'n v. Bushy Creek Mun. Util. Dist.*, 917 S.W.2d 19, 23-24 (Tex. 1996); *Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd.*, 156 S.W.3d 91, 104 (Tex. App.—Austin 2004, pet. denied); *Amaral-Whittenberg v. Alanis*, 123 S.W.3d 714, 719 n.4 (Tex. App.—Austin 2003, no pet.).

"The gas utility in a ratemaking proceeding shall reimburse the governing body of the municipality for the reasonable cost of the services of a person engaged under [the statute] to the extent the applicable regulatory authority determines reasonable." *Id*. § 103.022(b). As noted above, the utilities code defines "rate" broadly:

(A) any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a gas utility for a service, product, or commodity described in the definition of gas utility in this section; and

(B) a rule, regulation, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification.

*Id*. § 101.003(12). A "proceeding" is a hearing, investigation, inquiry, or other procedure for finding facts or making a decision under GURA. *Id*. § 101.003(11). The term includes a denial of relief or dismissal of a complaint. *Id*.

Under GURA, a utility's rates may be changed in only two ways—by petition of the utility or by a rate-setting authority, such as the Commission or the City. *See id*. §§ 104.102, .151. A proceeding that changes the amount charged customers may be a ratemaking proceeding in circumstances where the proceeding is functionally equivalent of the procedures for notice and hearing described in subchapters C and D of the utilities code. *See Southwestern Pub. Serv. Co. v. Public Util. Comm'n of Tex.*, 962 S.W.2d 207, 219-20 (Tex. App.—Austin 1998, pet. denied); *see also* Tex. Util. Code Ann. §§ 104.103-.151. "[N]ot all matters that have a potential effect on rates are ratemaking proceedings. Only matters directly resulting in changed rates constitute ratemaking proceedings." *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 220. The requirement that a ratemaking

27

proceeding be the result of some sort of application to change the amount of money a utility can charge its customers ensures "that the proceeding is one directly devoted to setting rates and is not one peripherally related to rates." *Id*. at 219.

The City argues that the proceedings at issue in *Southwestern Public Service Co.*, 962 S.W.2d at 217-20, are substantially identical to those at issue in this case and should entitle it to reimbursement of its expenses. In *Southwestern Public Service Co.*, we considered the issue of whether fuel reconciliation proceedings in the context of electricity regulation were "ratemaking proceedings." *Id*. The utility in that case sought review to reconcile its fuel expenses when its "predetermined customer rates" resulted in over- or under-recovery of its fuel expenses. *Id*. at 210. We held that those reconciliation proceedings were the functional equivalent of ratemaking proceedings because the actual amount of the rate was fixed in an earlier proceeding. *Id*. at 219-20. The purpose of the reconciliation proceeding, in other words, was to change the rates that had no provision for allowing a pass-through for costs related to variations in the cost of fuel. *See id*. As we have explained above, the PGA clauses in this case are an integral part of the approved rate. No party is attempting to modify the clauses themselves, only to review compliance with the rate. Thus, the proceedings at issue in *Southwestern Public Service Co.* are not similar to those we are considering here.

We have already concluded that the issue presented here is one concerning alleged misapplication of Entex's approved rates, not the setting of Entex's rates.[22] The City is not seeking

---

[22] The City's petition to the Commission to engage in retroactive review of Entex's gas purchases reflects this distinction. The City did not cede its jurisdiction to set rates. Instead, it alleged only that (1) Entex's gas purchases were unreasonable; (2) Entex's allocation of purchased

28

to adjust the formula contained in the PGA clause or to change Entex's rates. It is merely requesting a review of gas purchases to ensure that the customer charge complies with Entex's approved rate. As a result, these proceedings are not "ratemaking proceedings," and the City is not entitled to reimbursement for its costs for its participation in the review. We sustain Entex's second issue.

## CONCLUSION

We have concluded that the Commission has the authority to review Entex's past gas purchases when the costs associated with those purchases were passed through to Entex's customers through the application of the PGA clauses in Entex's filed rates and that the Commission has the power to order refunds if it determines that Entex's gas purchases were imprudent. We have also determined that the Commission's exercise of those powers do not violate the filed rate doctrine or the rule against retroactive ratemaking, and we thus affirm the judgment of the district court concerning those issues. We emphasize that Entex has only presented for our review facial challenges to the Commission's authority to conduct the prudence reviews. We express no opinion regarding other issues, if any, that might be raised by the Commission's application of this authority in any particular circumstance.

We have also found that a prudence review is not a ratemaking proceeding for purposes of utilities code section 103.022(b), and therefore the City is not entitled to recover its expenses incurred while participating in those proceedings. Accordingly, we reverse the judgment

gas discriminated against residential and small commercial customers; (3) its tariffs were false and misleading (but did not request that new rates be set); and (4) the PGA clause included improper charges.

of the district court in part and render judgment that the City is not entitled to its expenses under utilities code section 103.022(b).

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed in Part; Reversed and Rendered in Part

Filed:   April 21, 2006

**APPENDIX A**

**ENTEX**
**RATE SHEET**
**RESIDENTIAL SERVICE**
**RATE SCHEDULE NO. R-1446-2**

## APPLICATION OF SCHEDULE

This schedule is applicable to customers receiving gas for uses usual in a home through a single meter serving a single family dwelling and its related structures. Natural gas supplied hereunder is for the individual use of the customer at one point of delivery and shall not be resold or shared with others.

## NET MONTHLY RATE

| | | | |
|---|---|---|---|
| First | 400 cubic feet or less | $9.19 | |
| Next | 2,600 cubic feet | .6536 per 100 cubic feet | |
| Next | 7,000 cubic feet | .5412 per 100 cubic feet | |
| Over | 10,000 cubic feet | .5208 per 100 cubic feet | |

## MINIMUM MONTHLY BILL     $9.19

## PAYMENT

Bills shall be rendered on a monthly basis and are due and payable within ten (10) days from the date of bill.

## PURCHASED GAS ADJUSTMENT PROVISION

The above net monthly rate per unit sold is predicated upon a price of natural gas purchased for resale hereunder of $4.5705 per Mcf. To the extent that ENTEX's price of natural gas to be purchased (adjusted to correct any prior variations from actual costs) for resale hereunder increases or decreases, said net monthly rate shall be adjusted up or down to reflect (i) changes in such cost of gas per unit sold and (ii) changes in gross receipts taxes resulting from such increases or decreases in the net monthly rate. For purposes of calculating said adjustment, it shall be proper for ENTEX to determine its cost of gas from its several suppliers and the gross receipts taxes to be paid on the basis of a logical geographical area.

If ENTEX receives any refunds of any increased cost of purchased gas that have been passed on under this provision, a refund shall be made to customers served by this rate schedule.