# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00242-CV

**The Railroad Commission of Texas, CenterPoint Energy Resources Corp. d/b/a CenterPoint Energy Entex and CenterPoint Energy Texas Gas, Appellants**

**v.**

**Texas Coast Utilities Coalition and State of Texas Agency Consumers, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-09-000982, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## O P I N I O N

The pivotal issue in this administrative appeal is whether the Legislature's statutory delegation of authority to the Railroad Commission to regulate the "rates" of gas utilities empowers the agency to approve or impose a rate schedule that includes a mechanism for annually adjusting customer charges based on the utility's actual operating expenses, return on investment, and franchise tax payments—adjustments that would be made without the need or requirement to initiate a subsequent rate proceeding before either the Commission or any municipalities having original jurisdiction over the rates. In the view that it possesses such power, the Railroad Commission approved a new rate schedule for appellant CenterPoint Energy Resources Corp. d/b/a CenterPoint Energy Entex and CenterPoint Energy Texas Gas (CenterPoint), that contained the adjustment mechanism. Disagreeing with the Commission's view of its authority, the

district court reversed the Commission's order approving CenterPoint's rate schedule. CenterPoint and the Railroad Commission appeal. We will reverse the district court's judgment.

## BACKGROUND

CenterPoint is a "gas utility" within the meaning of the Gas Utility Regulatory Act (GURA). *See* Tex. Util. Code Ann. § 101.003(7) (West Supp. 2010); *see generally id.* §§ 101.001-105.051 (West 2007 & Supp. 2010). Under GURA, the Railroad Commission and individual municipalities share jurisdiction to regulate gas utilities, including "establish[ing] and regulat[ing] rates of a gas utility" and adopting rules for determining "the classification of customers and services" and "the applicability of rates." *Id.* § 104.001(b). Municipal governing bodies are vested in the first instance with "exclusive original jurisdiction over the rates, operations, and services of a gas utility within the municipality, subject to the limitations imposed by [GURA]," though they may opt to cede this jurisdiction to the Railroad Commission. *Id.* §§ 102.001(a)(1)(B), 103.001, .003. In areas outside of municipal boundaries—termed the "environs"—the Railroad Commission has exclusive original jurisdiction over a gas utility's "rates and services." *See id.* § 102.001(a)(1)(A); *see also CenterPoint Energy Entex v. Railroad Comm'n*, 213 S.W.3d 364, 367 (Tex. App.—Austin 2006, no pet.) (describing environs). GURA contemplates that the relevant "regulatory authority" exercising jurisdiction will conduct proceedings to establish gas-utility rates through application of cost-of-service ratemaking standards and principles. *See* Tex. Util. Code Ann. §§ 103.021, 104.051-.058; *see also Railroad Comm'n v. Entex, Inc.*, 599 S.W.2d 292, 294 (Tex. 1980) (summarizing these principles). Orders or ordinances of a municipality exercising its exclusive, original jurisdiction under GURA may be appealed to the

2

Railroad Commission, *see id.* §§ 102.001(b), 103.051, and an appeal from "a rate proceeding before a municipality's governing body" is reviewed de novo and "based on the test year presented to the municipality adjusted for known changes and conditions that are measured with reasonable accuracy." *Id.* §§ 103.051, .055.

The areas that CenterPoint serves in Texas include its "Texas Coast Division," which encompasses a region sweeping generally from Montgomery County, northwest of Houston, around Houston's west and south boundaries to Galveston and Freeport. Desiring to increase its rates throughout the Division—the first such increase in more than thirty years—CenterPoint, as GURA requires, filed notices of intent to increase its rates with the governing bodies of each of the forty-seven municipalities whose boundaries lie within the Division and, with respect to the environs, with the Railroad Commission. *See id.* § 104.102. Thirty-eight of the forty-seven municipalities approved some version of CenterPoint's request. The nine remaining municipalities, which comprise appellee Texas Coast Utilities Coalition (TCUC), denied CenterPoint's request.[1] CenterPoint appealed each of these municipal decisions to the Railroad Commission, *see id.* §§ 102.001(b), 103.051, which consolidated those appeals with the pending environs proceeding. *See* 16 Tex. Admin. Code § 1.125 (Railroad Comm'n, Consolidation & Joint Hearings) (providing that Commission may consolidate proceedings that involve common questions of law or fact). A group of Texas state agencies and higher-education institutions that are customers of CenterPoint, appellee State of Texas Agency Consumers (the State Agencies), intervened.

---

[1] The nine TCUC cities are Angleton, Baytown, Clute, Freeport, League City, Pearland, Shoreacres, West Columbia, and Wharton.

Following a three-day contested-case hearing that the Commission conducted itself, the Commission rendered a final order establishing a new rate schedule for CenterPoint applicable within both the Texas Coast Division environs and the TCUC municipalities. The record reflects that the proceedings addressed the elements of cost-of-service ratemaking, including determining the amount of CenterPoint's reasonable and necessary operating expenses and its rate base, ascertaining a reasonable rate of return, and allocating payment of the required revenues among three customer classes—"Residential," "General Service-Small," and "General Service-Large Volume." The Commission rejected several of CenterPoint's proposed calculations relating to its expenses and revenues and ultimately granted the utility an increase in revenues of approximately $1.2 million out of $2.9 million it had requested.

The rate schedule approved by the Railroad Commission prescribed a "monthly rate" for each of the three classes of CenterPoint customers. The monthly rate was to be the sum of three component figures or calculations. The first component was a "base rate" consisting of a flat "customer charge" plus fixed volumetric charges for each hundred cubic feet of gas consumed. These fixed charges, at least at the time the rate schedule was initially to take effect, were derived from historical test-year data, in the manner customary for cost-of-service ratemaking. The next two components of the monthly rate, unlike the fixed charges that comprised the base rate, were variable charges that provided for ongoing adjustments to reflect changes in certain of CenterPoint's actual costs. The first of these variable components, a "tax adjustment," served to pass through to the customer the actual amounts of any municipal franchise fees imposed on CenterPoint in a given month and the customer's proportionate share of any revenue-based taxes (i.e., excluding ad valorem

4

and income-based taxes) actually levied upon CenterPoint. The second variable component of the monthly rate was a "gas cost adjustment" that similarly functioned to pass through the utility's actual purchased-gas costs to customers. The amount of the gas-cost adjustment was to be calculated through application of a formula in a "Purchased Gas Adjustment" (PGA) tariff.

CenterPoint's PGA tariff or clause was materially similar to the PGA clause we explored at length in another case involving the utility, *CenterPoint Energy Entex v. Railroad Commission*, 208 S.W.3d 608, 616-17 (Tex. App.—Austin 2006, pet. dism'd). As we observed there, PGA clauses have long been widely utilized in gas-utility regulation nationwide, and their use and approval in Texas predates GURA's enactment. *See id.* at 613 (citing *San Antonio Indep. Sch. Dist. v. City of San Antonio*, 550 S.W.2d 262, 266-67 & n. 2 (Tex. 1976); *Railroad Comm'n v. High Plains Natural Gas Co.*, 613 S.W.2d 46, 48 (Tex. Civ. App.—Austin 1981, writ ref'd n.r.e.) (citing *City of Chicago v. Illinois Commerce Comm'n*, 13 Ill.2d 607, 150 N.E.2d 776 (1958)); *Railroad Comm'n v. City of Fort Worth*, 576 S.W.2d 899, 902 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.)). These mechanisms "operate[] to increase or decrease the revenue of the gas company by exactly the amount of its increased or decreased costs of gas charged the gas company by its suppliers," thereby passing on the utility's actual gas costs to customers on a dollar-for-dollar basis. *Id.* at 612.

One well-recognized implication of this type of rate structure is that—with the exception of fluctuations in purchased-gas costs and the costs passed through the tax adjustment—CenterPoint (or, alternatively, its customers) would bear the risk, all other things being equal, that the utility's actual revenues, expenses, etc., would prove to depart significantly

5

from the historically-based projections from which the rates were derived, resulting in the utility "over-" or "under-recovering" relative to its actual costs and prescribed reasonable rate of return, unless and until the rates could be changed prospectively through another round of rate proceedings. *See, e.g.*, *Railroad Comm'n v. Lone Star Gas Co.*, 656 S.W.2d 421, 423 (Tex. 1983) (describing "regulatory lag" and its effects on utilities); *CenterPoint Energy Entex*, 208 S.W.3d at 617 (contrasting "bifurcated regulatory treatment" of fuel costs, which are addressed through PGA clauses due to their volatility, and "most [other] costs," which tend to increase gradually and predictably such that it is "deemed satisfactory" to address them through "fixed components of the rate schedule" derived from "historically based projections of future costs"). With the express goal of reducing such risks and the need or impetus for "full-blown" rate proceedings in the event such risks came to fruition, the Railroad Commission approved, as part of CenterPoint's rate schedule, a version of a "cost-of-service-adjustment" (COSA) rate schedule or clause that CenterPoint had requested. The COSA clause was made effective for an initial term of three years, subject to automatic three-year extensions unless CenterPoint or the regulatory authority having original jurisdiction gave written notice to the contrary.

Simply described, the COSA clause provided a mechanism whereby CenterPoint's monthly rates could be adjusted annually to reflect changes in the utility's actual cost of service and rate base relative to the historically-based data from which the fixed components of those rates had originally been derived. More specifically, the clause prescribed that a "rate adjustment" was to be made, effective each August 1, in an amount derived from the following economic data:

6

- CenterPoint's actual operating expenses for the preceding calendar year. Included in these expenses were to be depreciation and amortization expenses, taxes other than federal income taxes or those addressed through the tax adjustment, operation and maintenance expenses, "customer-related" expenses, administrative and general expenses, and interest on customer deposits. As with the original rate calculation, the amount did not include purchased-gas costs, which were instead addressed through the PGA clause.

- CenterPoint's actual return on investment for the preceding year, calculated by multiplying the pre-tax rate of return that the Commission had set in the rate proceeding times the utility's "rate base balance" for the preceding year. In CenterPoint's rate case before the Commission, the parties had stipulated to underlying data that yielded an 11.8% reasonable rate of return. The "rate base balance" was to include new utility plant in service, inventories, prepayments, and cash working capital, less customer advances, customer deposits, and deferred income taxes.

- CenterPoint's actual Texas franchise tax payment for the preceding year.

- CenterPoint's actual "non-gas revenue and other revenue (i.e., transportation revenue and service charges)" for the preceding year.

The "rate adjustment" was to be calculated by adding the first three figures (operating expenses, return on investment, and franchise tax payment), subtracting the "non-gas revenue and other revenue" figure, and adjusting the remainder for franchise taxes:

$$\frac{\text{(operating expenses + return on investment + franchise tax) - (actual non-gas and other revenues)}}{\text{(1 - Texas franchise tax statutory rate)}}$$

The result of this calculation—which could be either positive (i.e., a price increase) or negative (i.e., a price decrease)—was then to be "allocated among the customer classes in the same manner as the cost of service was allocated among classes of customers in [CenterPoint's] latest effective rates in the Texas Coast Division." These allocated amounts would then be converted to a per-customer adjustment by dividing each customer class's allocated amount by its average number of customers. The resulting per-customer adjustment would then be divided by twelve to yield a "monthly

7

adjustment amount, either an increase or decrease, which will be included in the Residential Service, General Service-Small, and General Service-Large Volume customer charges." Any adjustments were capped at five percent of the customer charge effective at the end of the preceding calendar year.

The COSA clause also prescribed procedures through which CenterPoint was to give notice of impending adjustments, disclose its underlying data, and afford regulatory authorities the opportunity to scrutinize and oppose proposed adjustments. CenterPoint was required to file, by May 1 of each year, a sworn statement reporting the above-specified data for the preceding calendar year. Within 45 days of filing the required information, CenterPoint was required to publish notice to its customers similar in form to a notice to increase rates under GURA, including a description of the proposed revisions to rates and their effects on customer charges. Also, following CenterPoint's filings, each regulatory authority with original jurisdiction was to have 90 days to review the proposed rate adjustments. During this period, the authority had the right to obtain "additional information and supporting documents" from CenterPoint within ten working days of its request. After reviewing the proposed adjustment, the regulatory authority could also negotiate changes to the adjustment with CenterPoint or deny it outright. If not denied within the 90-day period, the adjustment would take effect. If a municipality denied an adjustment, the COSA clause authorized CenterPoint to appeal the decision to the Railroad Commission. During the pendency of such an appeal, CenterPoint could proceed to implement the adjusted rates as determined under the COSA clause, subject to refund if the municipality ultimately prevailed.

Finally, the COSA clause emphasized that it "does not limit the legal rights and duties of the regulatory authority" and that "[n]othing herein shall abrogate the jurisdiction of the regulatory authority with respect to whether rates charged are just and reasonable." In other words, if CenterPoint obtained, though the COSA clause, upward adjustments yielding what a regulatory authority regarded as unjust or unreasonable rates, the clause did not prevent the authority from initiating a conventional rate case, as before, to seek reductions in CenterPoint's customer charges. On the other hand, the COSA clause did alter the status quo to the extent that it enabled CenterPoint to obtain the upward adjustments without having to initiate the conventional rate case that otherwise would have been required.

TCUC and the State Agencies sought judicial review of the Railroad Commission's order. *See* Tex. Util. Code Ann. § 105.001; *see also* Tex. Gov't Code Ann. § 2001.171 (West 2008). Collectively, they brought several issues complaining that various of the Commission's findings were inadequate or not supported by substantial evidence. They also asserted that the Commission had exceeded its statutory authority in approving the COSA clause. The district court agreed in part, holding that certain Commission findings relating to expenses paid to affiliated companies were inadequate and that the agency had exceeded its authority in adopting the COSA clause. Regarding the latter, the district court specifically concluded that the "Commission did not have statutory authority to impose [the COSA] on the [TCUC] cities with original jurisdiction . . . [or] . . . to adopt the COSA in [the environs]." Having found error in the Commission's order, the court remanded the matter for further proceedings. *See* Tex. Gov't Code Ann. § 2001.174(2) (West 2008).

9

CenterPoint and the Railroad Commission both appealed the district court's judgment. *See id.* § 2001.901(a) (West 2008).

## ANALYSIS

CenterPoint and the Railroad Commission each bring a single issue asserting that the district court erred in concluding that the Commission lacked authority to adopt or impose the COSA clause within either the environs or the TCUC municipalities. *See id.* § 2001.174(2)(B) (providing that district court may reverse or remand agency's decision if agency exceeds its authority). They do not challenge the district court's judgment of reversal on the alternative ground relating to the Commission's findings regarding payments to affiliates. Consequently, appellants ask that we reverse the district court's judgment concerning the Commission's authority and remand for further proceedings.

As with any dispute concerning the breadth of an administrative agency's authority, we begin our analysis by recognizing that agencies are entirely creatures of statute with no inherent authority of their own. *See CenterPoint Energy Entex*, 208 S.W.3d at 615 (citing *Texas Natural Res. Conservation Comm'n v. Lakeshore Util. Co., Inc.*, 164 S.W.3d 368, 377 (Tex. 2005)). Instead, an agency's authority is limited to (1) powers expressly conferred by the Legislature, and (2) powers that are "reasonably necessary" to effectuate the Legislature's expressly conferred powers, so as to be considered implicit in the Legislature's express grant. *See Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 192-93 (Tex. 2007) (quoting *Public Util. Comm'n v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001)). This is so regardless of whether a particular agency action might be deemed salutary as a matter of policy or administration, as

10

an agency "'may not exercise what is effectively a new power' in addition to powers expressly conferred by statute or necessary to accomplish its express duties 'on the theory that such exercise is expedient for administrative purposes.'" *State v. Public Util. Comm'n*, 344 S.W.3d 349, 356 (Tex. 2011) (quoting *City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 441 (Tex. 2002)). Nor may an agency "contravene specific statutory language, run counter to the general objectives of the statute, or impose additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *CenterPoint Energy Entex*, 208 S.W.3d at 615-16 (citing *City of Austin*, 92 S.W.3d at 441; *State v. Public Util. Comm'n*, 131 S.W.3d 314, 321 (Tex. App.—Austin 2004, pet. denied)).

Resolution of the present dispute thus turns on statutory construction, which presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). In construing a statute, our primary objective is to give effect to the Legislature's intent. *Id*. We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)); *see also* Tex. Gov't Code Ann.

11

§ 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We also presume that the Legislature was aware of the background law and acted with reference to it. *See Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). We further presume that the Legislature selected statutory words, phrases, and expressions deliberately and purposefully. *See Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635 (Tex. 2010); *Shook v. Walden*, 304 S.W.3d 910, 917 (Tex. App.—Austin 2010, no pet.). Only when the statutory text is ambiguous—i.e., susceptible to more than one reasonable interpretation—"do we 'resort to rules of construction or extrinsic aids.'" *Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)). Similarly, if the statute is ambiguous, we give deference to a reasonable construction by an agency charged with the statute's administration. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624-25 (Tex. 2011).

Both appellants urge that the Legislature explicitly delegated extraordinarily broad power to the Railroad Commission to regulate gas-utility rates. They seek textual support, first, in the Legislature's declarations and descriptions of GURA's overarching purposes. GURA as a whole is founded on the Legislature's findings that "gas utilities are by definition monopolies in the areas they serve" such that "the normal forces of competition that regulate prices in a free enterprise society do not operate." *See* Tex. Util. Code Ann. § 101.002(b). To substitute for market competition, the Legislature enacted GURA with the express goal of providing "a

12

comprehensive and adequate regulatory system for gas utilities to assure rates, operations, and services that are just and reasonable to the consumers and to the utilities." *Id*. § 101.002(a), (b). The Legislature has further instructed that, to this end, GURA is to be "construed liberally to promote the effectiveness and efficiency of regulation of gas utilities to the extent that this construction preserves the validity of [GURA] and its provisions." *Id.* § 101.007. Appellants view these provisions as directives to the Commission to exercise broad and "comprehensive" powers that should be "liberally construed" to the end of "promot[ing] . . . effective[] and efficien[t] regulation of gas utilities." *Id.* §§ 101.002, -.007. And the COSA clause, appellants insist, embodies such "efficient" and "effective" regulation, enabling CenterPoint's rates to "self-correct" without the cost and regulatory lag of a conventional rate case.

Appellants additionally point to a more direct delegation of power to the Railroad Commission that appears within chapter 104 of GURA. Chapter 104 is titled "Rates and Services." Within a section titled "Authorization to Establish and Regulate Rates"—the first in the chapter—the Legislature provided the following: "The [R]ailroad [C]ommission is vested with all the authority and power of this state to ensure compliance with the obligations of gas utilities in [GURA]." *Id.* § 104.001(a). Appellants view this delegation as granting the Commission not only sweeping power in regard to the regulation of gas utility rates, but also great flexibility in regard to the regulatory tools it utilizes.

These broad delegated powers, appellants conclude, would encompass authority to approve the COSA clause. And this would be so, appellants add, in both the environs and within municipalities exercising exclusive original jurisdiction. Although recognizing that municipalities

13

have exclusive, original jurisdiction to regulate rates within their boundaries in the first instance, appellants insist that the Railroad Commission effectively has full control over the rates there via its exclusive appellate jurisdiction and de novo standard of review. *See id.* §§ 102.001(b), 103.055.

Appellants seek additional textual support for their position in GURA's definition of "rate":

(A)   any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a gas utility for a service, product, or commodity described in the definition of gas utility in this section; and

(B)   a rule, regulation, practice, or contract affecting the compensation, tariff, charge, fare, toll, rental, or classification.

*Id*. § 101.003(12). As appellants observe, this definition encompasses not only specific charges imposed on a gas utility's customers, but also a "rule," "regulation," or "practice" "affecting" those charges. And it is for this very reason, as appellants further emphasize, that we recently held that a rate schedule containing a variable or formula for determining the amount of a customer charge—specifically, a PGA clause—was a "rate" within GURA's definition. *See CenterPoint Energy Entex*, 208 S.W.3d at 619.

The principal issues in *CenterPoint Energy Entex* were whether the Railroad Commission had statutory authority to conduct a retroactive prudence review of charges that CenterPoint had flowed through a PGA clause and, if so, whether such a proceeding was a "ratemaking" proceeding for which a municipality could seek expense reimbursement. *Id.* at 612; *see* Tex. Util. Code Ann. § 103.022(b). We answered the former question in the affirmative and the

14

latter question in the negative.  Integral to our analysis of both questions, and to our disposition of related complaints by CenterPoint that the retroactive prudence review violated the filed-rate doctrine and amounted to impermissible retroactive ratemaking, was our conclusion that the prudence review was not in itself "ratemaking" but permissible Commission action to ensure that CenterPoint had charged its customers in a manner consistent with its preexisting approved "rates"—"rates" that incorporated the PGA clause as one of their components.  *See CenterPoint Energy Entex*, 208 S.W.3d at 616-26.

While we acknowledged that GURA does not explicitly mention PGA clauses, *see id.* at 613, we concluded that the act's broad definition of "rate" nonetheless encompassed and contemplated this sort of adjustment mechanism.  *See id*. at 618 (quoting Tex. Util. Code Ann. § 101.003(12)).  Focusing on the second prong of the definition (the portion referencing a "rule," "regulation," or "practice" "affecting" customer charges), we discerned that "[t]hrough this language, the [L]egislature has recognized that a rate may consist not merely of a fixed dollar amount but may instead be a rule 'affecting' the charge, a term contemplating the use of variables." *Id.* Consequently, we reasoned, CenterPoint's approved rate schedules, which prescribed "a three-step process for computing a customer's monthly gas charge"—(1) a fixed minimum monthly charge plus (2) a fixed volumetric charge (3) adjusted under the PGA clause for deviations between actual purchased-gas prices and a set gas purchase price—constituted a "rule" affecting the charge that "fits squarely within the statutory definition of 'rate.'" *Id.* at 618-19.  In further support of our holding, we approved of the reasoning in federal precedent recognizing that the Federal Energy Regulatory Commission could approve "a tariff containing a rate 'formula' or a rate 'rule' instead

15

of a specific number" under the Federal Natural Gas Act, *id.* at 619 (quoting *ChevronTexaco Exploration & Prod. Co. v. Federal Energy Regulatory Comm'n*, 387 F.3d 892, 895 (D.C. Cir. 2004) (quoting *Transwestern Pipeline Co. v. Federal Energy Regulatory Comm'n*, 897 F.2d 570, 578 (D.C. Cir. 1990)), and the proposition, reflected in a secondary authority, that "rates generally may consist of [both] fixed values and variable components." *Id.* (citing Richard J. Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry*, 97 Harv. L. Rev. 345, 349 n.29 (1983)).

As previously noted, CenterPoint's approved rate schedule in this proceeding contains a similar PGA clause, as well as a tax-adjustment mechanism, and no party questions the Railroad Commission's authority to order either provision. Appellants insist that the COSA clause operates in materially the same manner—it amounts to a set of variables or formulae for calculating ongoing adjustments to customer charges in light of current economic data. Thus, they conclude, CenterPoint's rate schedule as a whole, including the COSA clause, was a "rate" that was well within the Railroad Commission's authority to adopt or impose. *See id.* at 618-19.

In response, appellees dispute that the Legislature's statement of GURA's general policy goals or its directive that the statute be "liberally construed" are the sweeping delegations of authority that appellants portray. They emphasize the principles that agencies possess only the powers granted them by express statutory grant or that are reasonably necessary to effectuate an express grant. *See Texas Mun. Power Agency*, 253 S.W.3d at 192-93. We agree with appellees on this point. Given the basic limitations on agency authority that appellees cite, the Legislature's general statements that it intended GURA to be a "comprehensive" and "adequate" regulatory

16

scheme that should be "construed liberally" in themselves merely beg the question as to what specific powers have been delegated to Railroad Commission in that scheme. *See* Tex. Util. Code Ann. §§ 101.002, .007. We must, in short, look to other provisions of GURA to ascertain whether the Legislature has granted the Railroad Commission the broad authority appellants claim.

We agree with appellants that GURA section 104.001—"The [R]ailroad [C]ommission is vested with all the authority and power of this state to ensure compliance with the obligations of gas utilities in [GURA]"—represents an extraordinarily broad delegation of authority to the Commission in regard to rate regulation. *See id*. § 104.001(a). "All of the authority and power of this state" is synonymous with the full breadth of Texas's "police power," its discretionary power to regulate conduct (subject to constitutional limitations) to protect or advance "the health, welfare, morals, and safety of its citizens." *See Black's Law Dictionary* 1541 (9th ed. 2009) (defining "state police power").

"The obligations of gas utilities" in GURA—i.e., what the Railroad Commission is given "[a]ll of the authority and power of this state" to ensure that utilities comply with—include not charging, collecting, or receiving "a rate for utility service" or imposing a "rule or regulation" except as GURA provides. Tex. Util. Code Ann. § 104.002. GURA prohibits a gas utility from "grant[ing] an unreasonable preference or advantage concerning rates or services to a person in a classification," "subject[ing] a person in a classification to an unreasonable prejudice or disadvantage concerning rates or services," "establish[ing] or maintain[ing] an unreasonable difference concerning rates or services between localities or between classes of service," or "directly or indirectly charg[ing], demand[ing], collect[ing], or receiv[ing] from a person a greater or lesser compensation

17

for a service provided or to be provided" than the compensation provided in schedules of "rates" it must file with each regulatory authority having original or appellate jurisdiction over the areas served. *Id.* §§ 104.004, .005(a); *see id.* § 102.151. The applicable "regulatory authority," in turn, is charged with ensuring that "each rate a gas utility [shall] . . . make, demand, or receive is just and reasonable," not "unreasonably preferential, prejudicial, or discriminatory but . . . sufficient, equitable, and consistent in application to each class of consumer." *Id.* § 104.003(a). GURA further contemplates that regulatory authorities will conduct "proceeding[s] involving a proposed rate change" in which the gas utility has the burden of proving that any "rate change" it proposes is just and reasonable and, alternatively, the burden of proving that the "existing rate is just and reasonable, if the proposal is to reduce the rate." *Id.* § 104.008.

A delegation of "[a]ll of the authority and power of this state" to ensure that utilities comply with the foregoing requirements would, all other things being equal, entail both expansive enforcement power and discretion in regard to the means through which the Railroad Commission pursues those ends. And it would seem to us that this discretion would provide sufficient flexibility to enable the Commission to effectuate the ultimate goal of "just and reasonable" rates through the use of variable or formula rates and not merely fixed charges. Indeed, as appellants emphasize, the Legislature appears to have explicitly contemplated as much in GURA's definition of "rate."

In response to appellants' arguments regarding GURA's "rate" definition and our analysis of it in *CenterPoint Energy Entex*, appellees emphasize at length what they perceive to be key differences between PGA clauses and the COSA clause. Among other distinctions, appellees point out that PGA clauses have a long history of use and approval in Texas, whereas the

18

COSA clause, as they see it, is a comparatively novel and untested regulatory improvisation. They likewise contrast the nature of costs that are flowed through a PGA clause versus the COSA clause. The historical use and approval of PGA clauses, as appellees accurately observe, was driven by regulatory recognition that fuel costs "are particularly subject to dramatic and unforeseen changes," are driven by market forces beyond a utility's control, and "constitute such a large proportion of a utility's total costs that any substantial regulatory lag in approving rate increases to reflect fuel cost increases can cause rapid financial ruin." *CenterPoint Energy Entex*, 208 S.W.3d at 617. The types of costs and revenues made the basis for adjustments under the COSA clause, by contrast, tend to be less volatile, be somewhat easier to predict or control, and thus have often been addressed in fixed components of a rate schedule. *See id.*

To the extent that appellees are asserting that the GURA's "rate" definition contemplates only PGA clauses and not other types of variable or formula rates, the statutory text belies that contention. The definition contains no such limitation, but refers broadly to "*a rule . . . affecting the compensation, tariff, charge, fare, toll, rental, or classification*" imposed on customers. *See* Tex. Util. Code Ann. § 101.003(12)(B) (emphasis added). And, applying the literal language of this provision, the COSA clause would, all other things being equal, come within GURA's definition of "rate," as it is "a rule, regulation, [or] practice . . . affecting the compensation, tariff, charge, [or] fare" imposed by CenterPoint. *See id.*; *CenterPoint Energy Entex*, 208 S.W.3d at 618-19.[2]

---

[2] We acknowledge that some of the language in the COSA clause itself is inconsistent with the notion that the clause is part of a "rate" as opposed to a means of adjusting a "rate." For example, the COSA clause purports to prescribe "rate adjustments" and "rate" "increases" or

19

The State Agencies, in fact, ultimately concede that GURA's "broad statutory definition of 'rate'" gives the Railroad Commission jurisdiction over "formula rates" that would not necessarily be limited to PGAs. However, "that GURA under some circumstances permits formula rates" does not, they insist, mean that the statute empowers the Commission "to approve any and everything that a party may wish to describe as a 'formula rate.'" And whether a particular formula rate is within the Railroad Commission's authority to adopt, the State Agencies urge, "can only be answered by reference to the substantive and procedural rate-setting provisions of GURA." The State Agencies, as well as the TCUC municipalities, ultimately rely on the assertion that the COSA clause conflicts with those GURA provisions. The existence of those conflicts, appellees reason, belies any authority on the part of the Commission to impose the clause.

Appellees rely in part on subchapter B of chapter 104, which governs the "Computation of Rates" in rate proceedings:

- "In establishing a gas utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of its reasonable and necessary operating expenses." Tex. Util. Code Ann. § 104.051.

---

"decreases" to the "monthly rates" that are determined elsewhere in the rate schedule. Similarly, we note that the adjustments yielded by the rate schedule's other variable mechanisms (the PGA clause and the tax adjustment and franchise fee tariffs) are, in contrast to the COSA adjustments, characterized within the schedule as components of the "monthly rate" itself. We conclude that this nomenclature is not material to our analysis. It is the Legislature's intent reflected in GURA's text that controls whether the COSA clause is part of a valid "rate" and was within the Railroad Commission's authority to adopt or impose. Applying that definition, as suggested above, the COSA clause comes within GURA's definition of "rate."

20

- "The regulatory authority may not establish a rate that yields more than a fair return on the adjusted value of the invested capital used and useful in providing service to the public." *Id.* § 104.052.

- "Gas utility rates shall be based on the adjusted value of invested capital used and useful to the utility in providing service and that adjusted value shall be computed on the basis of a reasonable balance between" (1) original cost (i.e., actual money or other consideration paid), less depreciation, and (2) current cost, less depreciation. *Id.* § 104.053(a); *see also id.* § 104.054 (requiring Railroad Commission to establish uniform rates and methods of depreciation). The regulatory authority is permitted to "consider inflation, deflation, quality of service being provided, growth rate of the service area, and need for the gas utility to attract new capital." *Id.* § 104.053(c). "Costs of facilities, revenues, expenses, taxes, and reserves shall be separated or allocated as prescribed by the regulatory authority." *Id*. § 104.053(e).

- "Net income shall be used to establish just and reasonable rates." *Id.* § 104.055(a). "Net income" for these purposes "means the total revenues of the gas utility from gas utility service less all reasonable and necessary expenses related to that gas utility service," as determined by the regulatory authority "in a manner consistent with this subchapter." *Id.* The subchapter addresses the treatment of several components of this calculation, including certain payments to affiliates, taxes and tax benefits, lobbying expenses, and civic and charitable contributions. *See id.* §§ 104.055(b)-(e), .056-.058.

As all parties acknowledge, these standards incorporate cost-of-service ratemaking principles and methods. *See id.* § 104.111 (referring to "the cost of service standard prescribed by Section 104.051"); *see also id.* § 103.055(a) (referencing use of historical test year in this analysis); *Entex, Inc.*, 599 S.W.2d at 294 (discussing cost-of-service ratemaking principles).

In addition to these requirements, subchapter C of chapter 104 prescribes several procedures that must be complied with when gas utilities seek to increase their "rates." A gas utility desiring to increase its "rates" must file a statement of such intent with the regulatory authority

having original jurisdiction over those rates at least thirty-five days before the effective date of the proposed increase. *See id.* § 104.102(a), (b). The statement of intent must include proposed revisions of tariffs and schedules and "a detailed statement" of each proposed increase, the effect the proposed increase is expected to have on the utility's revenues, and each class and number of utility consumers affected. *Id.* § 104.102(c). The utility must also "publish, in conspicuous form, notice to the public of the proposed increase once each week for four successive weeks in a newspaper having general circulation in each county containing territory affected by the proposed increase." *Id.* § 104.103(a)(1).

In response to the statement of intent, the regulatory authority may hold a hearing to determine "the propriety of the increase" and must do so if the proposed increase would constitute a "major" change—"an increase in rates that would increase the [utility's] aggregate revenues . . . more than the greater of $100,000 or 2½ percent." *Id.* §§ 104.101, .105. Pending a final determination, a local regulatory authority may suspend the operation of the new schedule for up to 90 days after it would otherwise have become effective, and the Railroad Commission may do the same for up to 150 days. *See id.* § 104.107(a). During this period, the regulatory authority may implement temporary rates; otherwise, the preexisting rates continue in effect. *See id.* § 104.108. Additional provision is made for gas utilities to put rates into effect under bond pending final determination. *See id.* § 104.109. "If, after hearing, the regulatory authority finds the rates are unreasonable or in violation of law, the regulatory authority shall . . . enter an order establishing the rates the gas utility shall charge or apply for the service in question," which "shall be observed thereafter until changed as provided by [GURA]." *Id.* § 104.110.

22

Finally, also of relevance is section 104.301 of GURA, commonly known as the "GRIP" (Gas Reliability Infrastructure Program) statute. *See id.* § 104.301. The GRIP statute provides that under certain circumstances a gas utility may file with the regulatory authority, outside of a traditional rate-making proceeding, a tariff or rate schedule providing for "an interim adjustment in the utility's customer charge or initial block rate" to reflect changes in invested capital. *See id.* Contrasting the GRIP statute with the more general ratemaking provisions in subchapters B and C of chapter 104, appellees urge that the twain reflect legislative intent that adjustments to other types of rate elements may be made solely through a traditional rate proceeding. In fact, as appellees emphasize, several Railroad Commission precedents applying the GRIP statute have recognized that:

> Until promulgation of [the GRIP statute] . . . , a utility could not increase its rates applicable to customers located within a municipality without filing with the regulatory authority a formal statement of intent rate case, including a comprehensive cost of service rate review.

*See, e.g.*, Tex. R.R. Comm'n, *Appeal Filed by ATMOS Energy Corp., Mid-Tex Div. for Review of Mun. Rate Actions Regarding the Annual GRIP from the Cities of Caldwell, et al.*, Docket No. 9585, Gas Util. Info. Bull. No. 781, 7 (Gas Servs. Div. Oct. 10, 2005) (final order).

By purporting to permit "piecemeal rate adjustments" based on changes to "isolated rate elements," appellees urge, the COSA clause authorized by the Railroad Commission flatly conflicts with chapter 104, subchapter B's requirements of a more comprehensive cost-of-service ratemaking analysis. *See* Tex. Util. Code Ann. §§ 104.051 (requiring the regulatory authority to "establish the utility's overall revenues . . ."), .053 (prescribing method for calculating adjusted value of invested capital), .055 (prescribing calculation of net income). They likewise complain that the

23

COSA clause purports to allow CenterPoint to obtain rate increases without complying with the procedures specified in chapter 104, subchapter C. With this, appellees emphasize the principle that where the Legislature has granted a power to an agency and prescribed the manner of its exercise, "the prescribed method excludes all others, and must be followed." *Cobra Oil & Gas Corp. v. Sadler*, 447 S.W.2d 887, 892 (Tex. 1968). In sum, appellees argue that the Railroad Commission exceeded its delegated powers in approving or imposing the COSA clause because it effectively created a sort of alternative rate-regulation or rate-adjustment mechanism that is not expressly authorized anywhere in GURA and is not "reasonably necessary" to effectuate what the Legislature has already deemed a "comprehensive and adequate regulatory system" under that act—but squarely conflicts with that system.

We observe that each of appellees' arguments hinges on the premise that an annual adjustment made pursuant to the COSA clause *changes* the existing "rate" in a manner implicating GURA's substantive and procedural ratemaking requirements. *See* Tex. Util. Code Ann. §§ 104.101-.112 (Subchapter C titled "RATE CHANGES PROPOSED BY UTILITY"), 104.151-.152 (Subchapter D titled "RATE CHANGES PROPOSED BY COMMISSION"), 104.101 ("major change" defined as "an increase in rates . . ."), 104.102(a) ("A gas utility may not increase its rates . . . ."), 104.102(c) (providing that statement of intent must include "proposed revision" and "proposed increase"). Appellants, in reply, insist that COSA adjustments instead reflect the mere application of an *existing* rate to determine a customer charge. *See Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 220 (Tex. App.—Austin 1998, pet. denied) ("[N]ot all matters that have a potential effect on rates are ratemaking proceedings. Only matters directly

24

resulting in changed rates constitute ratemaking proceedings."). In other words, the "rate" whose adoption was subject to the requirements of GURA chapter 104, in appellants' view, was the rate schedule as approved by the Commission, not subsequent calculations of customer charges under it. If appellees' view of the relevant "rate" is correct, they would be correct in claiming that conflicts exist between the COSA clause and GURA's ratemaking provisions. But these conflicts are resolved or avoided if we construe "rate" as appellants see it.

The text of GURA lends equal support to both constructions. Its definition of "rate," as previously noted, contains two prongs or elements. The first defines "rate" in terms of customer charges—"any compensation, tariff, charge, fare, toll, rental, or classification that is directly or indirectly demanded, observed, charged, or collected by a gas utility for a service, product, or commodity." Tex. Util. Code Ann. § 101.003(12)(A). The second prong refers more broadly to "rules" through which customer charges are calculated. *See id.* § 101.003(12)(B). The choice between the two prongs ultimately controls our disposition of this appeal.

In support of its order, the Railroad Commission concluded, in part, that its approval of a COSA tariff was within its jurisdiction and did not conflict with the rate-setting provisions of GURA. In concluding that there was no conflict, the Commission necessarily concluded that the second prong of GURA's "rate" definition was the controlling or relevant one. Considering the text of the "rule" definition in conjunction with the Legislature's broad delegation to the Commission of "all the authority and power of this state to ensure compliance with the obligations of gas utilities in [GURA]," we conclude that the Commission's construction was, at a minimum, a reasonable construction of a statutory scheme made ambiguous by the other prong of the "rule" definition.

25

Consequently, we will defer to that construction, *see Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d at 624-25, and accordingly reject appellees' assertions that the Commission's adoption of the COSA clause as part of CenterPoint's rate schedule was inconsistent with GURA's ratemaking provisions.

Beyond these assertions regarding GURA's ratemaking provisions, the TCUC municipalities urge that the Railroad Commission's construction of its authority conflicts with GURA's provisions conferring exclusive original jurisdiction on municipalities. Specifically, they complain that a "rate" that includes an adjustment mechanism subverts municipalities' exclusive original jurisdiction over "rates" within their boundaries by enabling CenterPoint effectively to implement subsequent changes without filing a rate case with each affected municipality, as GURA contemplates, in their view. But this argument, like the preceding ones, ultimately hinges on GURA's definition of "rate," presuming that each subsequent annual application of the COSA provision results in a "changed" rate by CenterPoint that triggers the requirement of a new rate case. We defer again to the Commission's reasonable construction of its authority in light of GURA's two-pronged "rate" definition. *See id.*; *see also* Tex. Util. Code Ann. § 103.001 (grant of exclusive original jurisdiction to municipal governing bodies is "subject to the limitations imposed by [GURA]").

The TCUC municipalities additionally argue that Railroad Commission rule 7.220(c) prohibits the Commission from using formula rates to determine environs rates because that section does not allow a municipality's cost-of-service adjustment clause to be applicable to an adjacent environs area. *See* 16 Tex. Admin. Code § 7.220(c) (Railroad Comm'n, Environs Rates). We note

initially that subsection (d) of this rule specifies that the rule "shall not apply to major rate changes or to changes in special rates," *see id.* § 7.220(d), and the Railroad Commission found that the rate change here constituted a major change. Regardless, however, the plain language of 7.220(c) and its context indicate that its purpose is not to preclude cost-of-service clauses in the environs. Generally stated, rule 7.220 sets out the guidelines the Railroad Commission uses to set environs rates, including its practice of allowing environs rates to be the same as the rates in effect in the adjacent municipalities. *See id.* § 7.220(a). Subsection (c) specifically addresses environs rate changes made pursuant to a cost-of-service adjustment clause:

> The Commission shall review, on a cost of service basis, an increase in an environs rate that the utility proposes pursuant to a cost of service adjustment clause, as defined in § 7.115(9) of this title (relating to Definitions). The cost of service adjustment clause in effect in the adjacent municipality shall not be applicable or put into effect for the affected environs area, although the utility may request the same rates that are in effect in the adjacent municipality for the environs area. The Commission may review the proposed rate increases pursuant to these clauses on an informal basis and will not schedule a formal hearing unless a complaint is received pursuant to subsection (b)(4) of this section or the Commission elects to conduct a formal hearing.

*Id.* § 7.220(c). Thus, rather than prohibiting the use of cost-of-service adjustment clauses for environs rates, this section simply provides that such clauses are subject to review by the Railroad Commission and will not be *automatically* applicable as adjacent municipality rates.

TCUC and the State Agencies also argue that a prior Railroad Commission order in a different proceeding establishes that the Railroad Commission has determined that it lacks the statutory authority to adopt adjustable rates for the environs. *See* Texas R.R. Comm'n,

27

*Statement of Intent of TXU Lone Star Pipeline to Establish an Integrity and Safety Assessment for Recovery of Pipeline Integrity Assessment and Management Expenses and Class Location Changes*, Docket No. 9304, Gas Utils. Info. Bull. No. 706, 13 (Gas Servs. Div. Aug. 26, 2002) (order of dismissal). TCUC contends that the *TXU* order precludes the Railroad Commission from adopting an adjustment clause outside of GURA statement-of-intent proceedings. Initially, we note that the COSA at issue here was, as discussed above, adopted as part of a GURA statement-of-intent proceeding initiated by CenterPoint. Thus, to the extent that TCUC's argument here relates to its incorrect assumption that each application of the COSA changes the existing "rate," we have already rejected that argument on the ground that the COSA itself is the rate adopted by the Railroad Commission under its statutory authority to adopt natural-gas rates. Regardless, however, the Railroad Commission's order in *TXU Lone Star Pipeline* does not sweep as broadly as TCUC suggests. In *TXU*, the Railroad Commission found that it—

> cannot establish the incremental rate requested by TXU LSP *without establishing the utility's reasonable and necessary operating expenses and appropriate rate of return on its invested capital*. There is no statutory authority granting the Commission the power to set an incremental rate for the sole purpose of allowing additional marginal revenue to the utility designed to recover additional rates of return on capital and additional operating expenses at the margin. The establishment of the incremental rate proposed by TXU LSP is outside the statutory scheme of the Texas Utilities Code.

*See id.* (emphasis added). Although the Railroad Commission does reject an incremental rate as being outside GURA, it does so in a way that makes it clear that its decision is limited to the

specific rate being proposed. Nothing in the decision suggests that such a rate would be prohibited in all circumstances.

Finally, in a post-submission brief, the TCUC municipalities emphasize that the Legislature failed to enact an amendment to GURA that, as they portray it, was aimed at allowing the Railroad Commission to establish cost-of-service adjustments.[3] But as the Texas Supreme Court has instructed us, we should "attach no controlling significance to the Legislature's failure to enact . . . proposed [legislation]." *See Ojo v. Farmers Group, Inc.*, —S.W.3d—, No. 10–0245, 2011 WL 2112778, at *18 (Tex. May 27, 2011) (quoting *Texas Emp't Comm'n v. Holberg*, 440 S.W.2d 38, 42 (Tex. 1969), and discussing the supreme court's longstanding reluctance to draw inferences from the Legislature's failure to act); *Entergy Gulf States*, 282 S.W.3d at 443 (citing *Holberg*, 440 S.W.2d at 42). Our analysis of the Railroad Commission's authority under GURA, in other words, must rest upon the words the Legislature actually enacted.

We conclude that the Railroad Commission's delegated authority under GURA encompasses the power to adopt or impose the COSA clause in both the Texas Coastal Division environs and the TCUC municipalities. We sustain appellants' sole issue on appeal.

**CONCLUSION**

Having sustained appellants' sole issue on appeal, we reverse the district court's judgment that the Railroad Commission exceeded its authority in adopting or imposing the

---

[3] *See* Tex. H.B. 2435, 82d Leg., R.S. (2011); Tex. S.B. 1309, 82d Leg., R.S. (2011).

29

COSA clause.  We remand this cause to the district court for further proceedings not inconsistent with this opinion.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Remanded

Filed:   October 27, 2011